653 P.2d 501 (1982)
In the Matter of the RATES AND CHARGES OF THE MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY.
MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, Appellant and Cross-Appellee,
v.
CORPORATION COMMISSION, Appellee and Cross-Appellee,
Jeff Bingaman, Attorney General, Intervenor-Appellee and Cross-Appellant.
No. 13881.
Supreme Court of New Mexico.
October 22, 1982.
*503 T.M. Ledingham, Albuquerque, Sutin, Thayer & Browne, Richard L.C. Virtue, Santa Fe, for appellant.
Jeff Bingaman, Atty. Gen., David Romero, Jr., Wayne Shirley, Asst. Attys. Gen., Santa Fe, for appellee Corporation Commission.
Jeff Bingaman, Atty. Gen., Richard H. Levin, James J. Wechsler, Asst. Attys. Gen., Santa Fe, for intervenor-appellee Attorney General.

OPINION
PER CURIAM.
In January 1981, Mountain States Telephone and Telegraph Company (Mountain Bell) filed an application for a rate increase of $48.3 million, based on a 1981 test year. The Attorney General of New Mexico (Attorney General) moved to intervene in the proceedings on behalf of the State and all New Mexico customers of Mountain Bell not otherwise represented. The State Corporation Commission (Commission) granted the Attorney General's motion. In July the Commission entered its final order authorizing an increase in rates of $27.236 million. Mountain Bell's petition for reconsideration was denied by the Commission and it then petitioned for removal to this Court pursuant to Article XI, Section 7 of the New Mexico Constitution. The Attorney General also filed a separate petition for removal. We address the issues raised by the Attorney General's removal before reaching the objections raised by Mountain Bell's removal.

I.
Mountain Bell raises procedural objections to the Attorney General's removal.
Mountain Bell claims that the Attorney General's representation both of the state and of unrepresented customers of Mountain Bell was improper. Mountain Bell notes that Article XI, Section 4 of the New Mexico Constitution requires the Attorney General to represent the Commission; it contends that his representation of other parties before the Commission is a conflict of interest and also a violation of his constitutional duty to represent the Commission.
Section 4 states in part: "The attorney general of the state, or his legally authorized representative, shall be the attorney for the commission." Mountain Bell argues that there is a conflict between this constitutional provision and Section 8-5-2, N.M.S.A. 1978, which states in part:
Duties of attorney general.
Except as otherwise provided by law, the attorney general shall:

*504 A. prosecute and defend all causes in the supreme court and court of appeals in which the state is a party or interested;
* * * * * *
J. appear before local, state and federal courts and regulatory officers, agencies and bodies, to represent and to be heard on behalf of the state when, in his judgment, the public interest of the state requires such action or when requested to do so by the governor; and
K. perform all other duties required by law.
Mountain Bell asserts that the Attorney General's duty to represent the Commission is "otherwise provided by law" so that Section 8-5-2 is inapplicable here. The Attorney General claims that the Constitution does not specifically prevent him from representing the state in these proceedings, so Section 8-5-2 does apply.
A short answer to this problem is that Mountain Bell waived any objection to the Attorney General's intervention by filing a Waiver of Objection at the time he filed his motion to intervene. However, this answer does not resolve the basic question. After reviewing the arguments and relevant evidence, we hold that, on the facts presented here, the Attorney General could properly represent the State and these customers. Our conclusion relies on the fact that although the Attorney General provides commissioned assistant attorneys general to the Commission as legal counsel, these individuals function independent of the Attorney General. There is no evidence of control exercised by the Attorney General over the Commission's legal staff. Mountain Bell's argument posits a conflict of interest which does not in fact exist. Thus this situation differs from those involved in the cases cited by Mountain Bell.
Mountain Bell's second objection is that the Attorney General's request for removal was not timely filed. N.M.R.Civ. App. 3(d), N.M.S.A. 1978, specifies that a party aggrieved by a final judgment in a civil action has thirty days from the date of that judgment in which to appeal to the appropriate appellate court. This rule applies to removal proceedings under N.M.R. Civ.App. 1(a), N.M.S.A. 1978. The Attorney General points out that N.M.R.Civ.App. 4(c), N.M.S.A. 1978, grants a party fifteen days from the date of service of notice of appeal if the notice is served later than fifteen days before the expiration of the time, within which the appeal may be taken. If Rule 4(c) applies, the Attorney General's removal was timely.
Rules 3(d) and 4(c) speak in terms of appeals, not removals. However, no other rule governs the period within which removals from the Commission's ratemaking proceedings may be taken.[1] Therefore we apply Rules 3(d) and 4(c) to this proceeding and hold that the Attorney General's petition for removal was timely filed.
The substance of the Attorney General's removal is that the Commission erred by not including in its rate determination Mountain Bell's revenues, expenses and investment related to directory advertising. The Commission acted properly in following the law as it had been set forth in our opinion in Corporation Com'n v. Mountain States Tel. & T. Co., 84 N.M. 298, 502 P.2d 401 (1972) (the 1972 case). The 1972 case held that the Commission had no authority to include Mountain Bell's net income from directory advertising in determining rates for intrastate telephone service. The rationale was that directory advertising was not essential to furnishing telephone services and was handled as a distinct, separate and competitive business.
We now reexamine that opinion and conclude that it must be overruled to the extent *505 that it prohibits inclusion of directory advertising in the Commission's ratemaking determinations.
Article XI, Section 7 of the New Mexico Constitution reads in part:
[I]n the matter of fixing rates of telephone and telegraph companies, due consideration shall be given to the earnings, investment and expenditure as a whole within the state... .
The Court in the 1972 case (which was before us upon a stipulation so that we could interpret the constitutional provision) saw only two possible and very different interpretations of this provision. First, this provision could give the Commission jurisdiction to consider "all earnings, investment and expenditures of Mountain Bell in the State, regardless of their relationship to the business of furnishing telephone service... ." Corporation Com'n v. Mountain States Tel. & T. Co., supra, at 301, 502 P.2d at 404. Second, the provision could mean that "only earnings, investment and expenditures directly used or useful in telephone service may be considered by the Commission in fixing rates." Id. The Court in the 1972 case adopted the latter approach, adding that the provision "does not refer to earnings from, investments in, and expenditures incurred by such a company in some business unnecessary to the furnishing of adequate telephone or telegraph services." Id. at 302, 502 P.2d at 405 (emphasis added).
Neither position is a fair application of the Constitution. Under the first, the Commission could include revenues from telephone company investments in wholly unrelated businesses. Under the second, the Commission's inquiry would be limited to revenues, expenses and investments incurred in providing the bare essential telephone service of black rotary telephones and party lines.
A more reasonable construction of the provision would allow the Commission to include earning, investment and expenditures used or useful in providing telephone service. The Commission currently considers revenues, expenses and investment related to designer telephones and custom calling services. These items are "used and useful" in providing telephone service. Directory advertising is no less "used and useful." We take judicial notice of the following captions taken from the 1981 Santa Fe Yellow Pages themselves which contain clear explanations of the usefulness of the advertising to both personal and business telephone customers.
The Yellow Pages are a help to home and business managers alike. These Pages are packed with important buying facts about things you need to run your home or business. Consult the Yellow Pages to find out "where to buy it." Action people let their fingers do the walking through the Yellow Pages.
Newcomer to town? Use the Yellow Pages to locate new dealers to serve you. The advertising in the Yellow Pages tells you where to buy it.
Save time, save money, save gas. The Bell System Yellow Pages offers an abundance of local and rational advertising conveniently packaged for quick and easy shopping by phone  it makes cents!
Purchasing agents and others who have to do with the buying of materials and parts find the Bell System Yellow Pages an invaluable aid in locating local sources of supply. Read the ads, get the facts ... fast!!!
The Commission could justifiably determine that these advertising services are a necessary component of providing adequate telephone service.
The fact that Mountain Bell handles directory advertising as a separate business has no relevance to whether the Commission may consider these revenues, expenses and investment. The only considerations are whether the services are "used and useful." Mountain Bell argues that directory advertising is subject to competition. However, the monopoly granted to Mountain Bell includes the privilege and duty of providing each customer, free of charge, with a directory. This unique privilege is not awarded on a competitive basis. The fact *506 that the Commission does not regulate the rates charged by Mountain Bell for directory advertising does not prevent the Commission from exercising its constitutional duty to consider "the earnings, investment and expenditure as a whole within the State."
The 1972 opinion expressed concern that if yellow page revenues or losses were considered the telephone customers might suffer for losses incurred by the telephone company "from some business which is not essential to the service for which they have subscribed and for which they are paying." Id. The proper protection against such an event is the Commission's power to disallow expenditures which are wasteful or imprudent. The Commission could not disallow prudent expenditures for essential telephone services since the telephone company is required to provide these services even if these resulted in a loss. Expenditures made for unnecessary services which result in a loss could be disallowed as wasteful and imprudent. The Commission has the authority to prevent Mountain Bell from using its customers' money in unnecessary and unprofitable ventures. But to the extent that Mountain Bell provides non-essential but profitable services which are "used and useful," the Commission must consider the related earnings, investment and expenditure as required by Article XI, Section 7.
Accordingly, we remand to the Commission with directions to include in its rate determinations Mountain Bell's revenues, expenses and investment related to directory advertising in New Mexico.
We are not unmindful of the fact that the voters will vote on a constitutional amendment in November 1982 that, if passed, would reach the same result, but we do not believe that we should hesitate to address what we consider to be an incorrect application of the law made by this Court in the past.

II.
In the remainder of this opinion, we discuss the objections to the Commission's order raised by Mountain Bell's removal.

Scope of Review
The parties disagree as to the proper scope of review in these removal proceedings. We believe this question was clearly resolved in Mountain States Tel. v. New Mexico State Corp., 90 N.M. 325, 563 P.2d 588 (1977). We now reaffirm that rule as plainly as we can in order to minimize future disputes.
In a removal proceeding governed by Article XI, Section 7 of the New Mexico Constitution, this Court may decide the case on the merits, without indulging in any presumptions. This rule has been expressed by stating that the Commission's order will not be disturbed if supported by "satisfactory and substantial evidence." State Corporation Com'n.v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 267, 270 P.2d 685, 689 (1954) (quoting San Juan C. & C. Co. v. S.F., S.J. & N.Ry. Co., 35 N.M. 512, 2 P.2d 305, 308 (1931)). The term "satisfactory" implies a weighing procedure. Even if substantial evidence supports the Commission, the weight of the evidence as viewed by this court may go counter to the Commission's order. The evidence must be substantial and satisfactory. This same standard of review was clearly articulated in different language in General Telephone Company of the Southwest v. Corporation Commission, 98 N.M. 749, 752, 652 P.2d 1200, 1204 (1982).
[W]e confirm the rule applicable in removal cases to be that under N.M. Const., Art. XI, § 7, this Court is not a ratemaking body and has no authority to determine what is a fair rate, but this Court will weigh the evidence to arrive at an independent determination as to whether the order entered by the SCC is just and reasonable... .
Accordingly, even if the Commission's order is supported by substantial evidence, we need not uphold it if the weight of the evidence is contrary. This Court may make an independent evaluation of the evidence *507 as to each part of the Commission's order. We do not set rates, however. We merely make an independent judgment as to whether the various components of the Commission's order are just and reasonable.

Fair Hearing
Article XI, Section 8 of the New Mexico Constitution specifies that "[t]he Commission shall determine no question nor issue any order in relation to the matters specified in the preceding section, until after a public hearing... ."
Mountain Bell asserts that various statements made by some of the Commissioners before, during, and after the hearing indicate an absence of fairness and impartiality. In particular, they point to statements made by one Commissioner to the press and on a radio call-in program prior to the scheduled hearing. For example, the record clearly indicates that while discussing Mountain Bell's service, rate requests, and advertising policies on the radio show on April 29, 1981, the Commissioner stated:
Say, they want $48,000,000 well, our staff consultant say [sic] for sure they don't rate any more than $29,000,000. So, we've already cut that in half and I don't know what it's going to be but I just think it will probably be lower than that. Well, if we could have included the revenues from yellow pages in at this time, we would already have it down to $22,000,000 and you start to see that's  we're getting it way down there.
In the context of the present case, we need not decide whether this statement or the others pointed out by Mountain Bell constitute a determination of the question prior to the hearing in violation of Section 8. Since we are free to judge the case on its merits, it is irrelevant to our decision whether the Commission exhibited improper bias or specific prejudgment. However, prehearing statements such as those referred to by Mountain Bell reflect poorly upon the rate setting process and encourage removal of the proceedings to this Court. This results in greater expenses to the State and to the parties in the proceeding even though the ultimate decision by the Commission may be completely fair, justified, and upheld.
The Constitution contains only a broad disqualification provision relating to conflicts of interests on the part of the Corporation Commission. N.M. Const., Art. XI, § 3. The Legislature has not set up a statutory disqualification procedure. The ultimate protection against unconstitutional prejudgment must remain the individual integrity of the Commissioners. We hold that, hereafter, comments by a Commissioner which constitute prejudgment may constitutionally taint any subsequent hearing so as to invalidate the ensuing order of the Commission. Should this occur, the company would be entitled to put its proposed rates into effect after the expiration of the six-month period as if the Commission had not acted. See N.M. Const., Art. XI, § 8.

Rate Of Return
The Commission and Mountain Bell each presented qualified witnesses who testified as to the appropriate rate of return which should be allowed to Mountain Bell. The main dispute involved the cost of equity. The parties exerted a good deal of effort in attacking and defending the various economic models, data, and assumptions used by the witnesses in reaching their recommendations. Mountain Bell's witnesses claimed that the cost of equity is in the 16.4%-17.7% range. The Commission's witness claimed that a return between 13.8%-14.7% would be proper. The Commission set the rate at 14.25%. Although the Commission's rate is supported by substantial evidence, we have independently evaluated its fairness and reasonableness based on the evidence presented. The ratemaking process involves a balancing of investor and consumer interests. Neither is paramount. To argue that the consumer interest is best served by focusing solely on the investor interests ignores the Commission's duty to set rates which, as much as possible, will allow general access to the phone system by the general public.
*508 The proper type of inquiry which we make has been expressed by the United States Supreme Court in Power Comm'n.v. Hope Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).
It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.
Id. at 602, 64 S.Ct. at 287. Although the Court went on to apply a different standard of review with respect to presumptions of validity, the quoted phrase recognizes the difficulties which appellate courts face in reviewing the testimony of experts. This does not mean that we can ignore the procedures used by the expert witnesses in reaching their conclusions. It merely means that, after examining the testimony, we need not reject any particular conclusion because the methods used to reach it may contain infirmities. It also means that the proper rate cannot be determined by mathematical formulas alone. In The Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511 (1913), the Court stated:
The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.
In fact, we have examined the expert testimony in this case and conclude that all the experts involved used data and assumptions which contain infirmities. Accordingly, we examine the rate of return authorized by the Commission to determine whether it is unjust or unreasonable.
The basic standard was announced in Bluefield Waterworks & I. Co. v. Public Service Com'n, 262 U.S. 679, 690, 692, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923).
Rates which are not sufficient to yield a reasonable return on the value of the property used, at the time it is being used to render the service, are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.
* * * * * *
What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally.
The rate of return set by the Commission does not appear unreasonable in light of historic returns. The following uncontradicted evidence was presented by the Commission's staff witness.

 Return on Average Common Equity
 1980 1979 1978 1977 1976
 Mtn. Bell (N.M.) 12.39 11.65 14.32 12.45 10.74
 Mtn. Bell (Total) 12.73 12.58 13.14 12.02 11.46
 AT&T 12.69 12.93 13.09 12.17 11.10

We recognize that business conditions existing in 1981 may justify a higher rate of return on equity. However, as we have indicated, rate regulation is a balancing of competing interests, and we cannot focus solely on investor interests. In other words, what is required is a reasonable return, not an optimal return, on equity.
*509 The approved rate of return does not appear out of line as compared with other rates of return permitted in other states of which we are aware. For example, the Georgia Public Service Commission granted at 14.25% rate of return on common equity on December 15, 1981. The Southern Bell Telephone Company accepted this rate. Georgia Public Service Commission File No. 19315, Docket No. 3286-U, December 15, 1981.
Mountain Bell asserts that the rate of return granted by the Commission results in the market value of its stock being less than its book value. Of course, it is referring to AT & T stock, which is the only medium through which Mountain Bell can raise equity capital as it is a wholly-owned subsidiary of AT & T. We find it difficult to believe that a higher rate of return on the New Mexico intrastate investment of Mountain Bell will materially affect the price of AT & T stock. Even if it did, we note that rate-making, "like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid." Power Comm'n v. Hope Gas Co., supra, 320 U.S. at 601, 64 S.Ct. at 287. After considering this evidence independently and exercising our best judgment, we conclude that the rate of return granted by the Commission is just and reasonable and therefore uphold that portion of the Commission's order.

License Contract Expenses
AT & T (primarily Bell Labs) does research and development for all the Bell operating Companies, which, as licensees, pay AT & T up to 2.5% of local and toll revenues. Historically, AT & T only required payment of 1% of the specified revenues. In recent years, however, this percentage has increased and now approaches the 2.5% limit. Since the revenues to which the percentage applies have also increased significantly, the Bell operating companies, including Mountain Bell, pay a substantial and a rapidly growing fee to AT & T.
For 1981, Mountain Bell's license contract expenses were estimated at $4.051 million. The Commission, deeming itself incapable of carefully analyzing these expenses, applied a formula based on historical growth and disallowed $1.188 million of these expenses. Mountain Bell claims it proved that New Mexico ratepayers have received benefits from AT & T's services in excess of these expenses, and that they should be fully allowed unless imprudent or wasteful.
This difficult problem has arisen in other states. The Commission pointed out the difficulty it faces in making a line-by-line evaluation of the license fees paid to AT & T. However, we think the use of a formula based on historic trends has no relation to current needs and neither protects against improper expenditures nor allows adequate flexibility for managerial decisions relating to research and development.
Instead, we adopt the approach taken by the Illinois Supreme Court in Illinois Bell Tel. Co. v. Illinois Commerce Com'n., 55 Ill.2d 461, 303 N.E.2d 364 (1973). There, the court stated:
We have considered the contentions of the parties, the testimony, the exhibits, and the authorities, and conclude that it is improper to permit Bell to include in its operating expenses for rate-making purposes a license fee to AT & T based on a percentage of revenues, and that the amount of the payment of the license fee must be directly related to, and include only, such expenditures as would be permissible if made by Bell.
303 N.E.2d at 375.
Accordingly, the burden is on Mountain Bell to show that the license contract expenses it claims include only payments for services which Mountain Bell itself could claim if it paid for such services independent of AT & T. Once proven, such expenses should be allowed by the Commission.

Station Connection Charges
Mountain Bell incurs expenditures associated with the installation of station apparatus, *510 inside wiring, and related activities. These expenditures are referred to collectively as station connection charges. In the past, these expenditures were fully capitalized. However, in 1981 the Federal Communications Commission (FCC) released an order requiring phone companies to phase in, over a four-year period, full expense treatment of these expenditures. Amendment of Part 31, 85 FCC 2d 818 (1981). Thus, Bell is to expense 25% of its station connection charges in 1981, 50% in 1982, 75% in 1983, and 100% in 1984. With the FCC's permission, Mountain Bell will recognize each of these accounting changes as of January 1 in each of the years involved.
The Commission has recognized the 25% expensing method for 1981. However, Mountain Bell's request that the Commission recognize the 50% expensing method for 1982 was denied. The Commission did allow known changes in 1982 expenses for employee benefits, Social Security, and postage fees. Mountain Bell asserts that the 50% expensing method is similar to those items and should therefore be permitted. The counter argument is that permitting Mountain Bell's request will result in a mismatching of revenues, expenses and investment, since Mountain Bell's actual 1982 performance is not known at present.
After considering this question on the merits, we conclude that the Commission properly refused Mountain Bell's request. The change in accounting procedures will not merely affect the level of expenses recognized by Bell; it will also reduce the growth in Mountain Bell's rate base and affect Mountain Bell's revenues, since customers will be charged directly for 50% of the station connection charges. Mountain Bell has asked for an increase in revenue in 1982 to cover the increased expense, but it has not shown what effect increased revenue and reduced capitalization will have.
We do not favor separate, formal rate hearings for each of the incremental changes necessitated by this phase-in program. We hold that Mountain Bell must make a more complete analysis of the effect of the automatic changes, which could then be incorporated in the rate structure. The Commission could then treat this phase-in program in the same manner it treated the Social Security and other changes. In this instance, however, Mountain Bell has not yet given the Commission adequate analysis of the impact of the accounting changes.

Interim Rate Relief
Mountain Bell claims that the Commission should have granted interim relief prior to the July order upon a showing that Mountain Bell was earning an inadequate rate of return. The validity of at least $17.620 million of rate increases was not disputed by the filed testimony, nor by the testimony adduced at the hearing. Mountain Bell asserts that the Commission's failure to permit interim relief of this amount resulted in several months' lost revenue. Mountain Bell asks that we hold that the Commission should grant interim relief if it is earning less than its latest authorized rate of return, if all testimony supports an increase, or if the rate is so low that it is confiscatory. We decline to do so.
The only constitutional relief available to regulated carriers is the six-month period in which the Commission must dispose of requests for rate increases. All parties admit, and we agree, that interim relief is permissible if present rates are confiscatory, but Mountain Bell failed to show this. Beyond protecting these constitutional values, we decline to formulate rules and regulations.

Deferred Income Taxes
Since Mountain Bell has used accelerated depreciation for tax purposes but straightline depreciation for determining rates, it has created a deferred income tax account. In the early years of a depreciable asset's life, Mountain Bell pays into the account, since its actual tax is less than its book tax. In later years, it uses the funds from the deferred tax account to pay the actual taxes which by then will be greater than the book taxes. In 1978, Congress reduced the *511 corporate tax from 48% to 46%, so Mountain Bell had a surplus in its deferred income tax account. The Commission required Mountain Bell to amortize the surplus over two years, but Mountain Bell claims it should do so over the life of the various depreciable properties.
Mountain Bell asserts that Congress has preempted state regulation of the deferred income account by giving the FCC authority to prescribe forms of accounts for companies under its jurisdiction. 47 U.S.C.A. §§ 220, 221; 47 C.F.R. § 31.176:1 (1980).[2]
There is substantial authority to the effect that state regulatory commissions are not precluded from specifying their own accounting methods for interstate purposes. Pacific Telephone & Tel Co. v. Public Utilities Com'n., 62 Cal.2d 634, 44 Cal. Rptr. 1, 401 P.2d 353 (1965), In Re Northwestern Bell Telephone Co., 73 S.D. 370, 43 N.W.2d 553 (1950), cert. denied, 340 U.S. 934, 71 S.Ct. 489, 95 L.Ed. 674 (1951); Amendment of Part 31, 68 F.C.C.2d 902 (1978). The District of Columbia Court of Appeals considered the Uniform System of Accounts used by the Federal Power Commission and concluded that "circumstances will dictate ratemaking judgments independent of the uniform accounting system." Wash. Pub. Interest Org. v. Public Serv. Com'n, 393 A.2d 71, 81 (D.C. 1978), cert. denied sub nom. Potomac Electric Power Co. v. Public Service Commission of the District of Columbia, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Thus, we hold that the Commission is not bound by the accounting procedures established by the FCC.
The Internal Revenue Service does not prohibit 2-year amortization in this case, but neither does it specifically permit it. Tax treatment of this amortization is therefore uncertain. The Kansas Court of Appeals has addressed this problem, noting that various states have treated the matter differently. Kansas Power & Light v. State Corp. Com'n., 5 Kan. App.2d 514, 620 P.2d 329 (1980). Mountain Bell has applied to the IRS for a ruling on the question, but has not yet received a response. The Commission's treatment in this case is appropriate, if it does not result in Mountain Bell losing tax benefits. Accordingly, Mountain Bell must abide by the Commission's order unless it receives a ruling from the IRS disallowing the two-year amortization, which would require Mountain Bell to ask the Commission for further relief.

CONCLUSION
We remand this case to the Commission with directions to amend its rate order after taking into consideration Mountain Bell's revenues, expenses, and investment in the Yellow Pages and after giving Mountain Bell adequate opportunity to justify its license contract expenses. The Commission shall enter any further orders consistent with this opinion.
NOTES
[1] N.M.R.Civ.App. 14, N.M.S.A. 1978, governs only the time within which briefs must be filed "after entry of an order of removal." Section 63-9-14, N.M.S.A. 1978, by its terms seems broad enough to cover removals from ratemaking proceedings, but it is part of the Telephone and Telegraph Company Certification Act (Sections 63-9-1 to 63-9-19, N.M.S.A. 1978), and therefore can only apply to certification proceedings. See N.M. Const., Art. IV, § 16; Gallegos v. Wallace, 74 N.M. 760, 398 P.2d 982 (1964).
[2] We note that the FCC's Uniform System of Accounts includes an account for revenue from Yellow Pages advertising. 47 C.F.R. 31.523 (1980). Mountain Bell's argument would necessarily mean that the supremacy clause of the U.S. Constitution precluded New Mexico from excluding Yellow Pages revenue from intrastate ratemaking considerations.