1997-NMSC-031

943 P.2d 1007

**In the Matter of the HELD ORDERS OF U S WEST COMMUNICATIONS, INC.,**

**U S WEST COMMUNICATIONS, INC., a Colorado corporation, Appellant,**

v.

**NEW MEXICO STATE CORPORATION COMMISSION, Appellee,**

and

**Tom Udall, Attorney General, State of New Mexico, Intervenor.**

No. 23518.

Supreme Court of New Mexico.

July 16, 1997.

Montgomery & Andrews, P.A., Thomas W. Olson, Santa Fe and U.S. West, Inc., Andrew E. Ottinger, Jr., Denver, CO, for Appellant.

Tom Udall, Attorney General and David Kaufman, Assistant Attorney General & General Counsel, Santa Fe, for Appellee.

Tom Udall, Attorney General, Charles F. Noble and Karl O. Wyler, Assistant Attorneys General, Santa Fe, for Intervenor.

## OPINION

BACA, Justice.

### I

1. Appellant, US WEST Communications, Inc. (US WEST) removed this matter from the New Mexico State Corporation Commission (the Commission) to the New Mexico Supreme Court pursuant to Article XI, Section 7, of the New Mexico Constitution, requesting that this Court review two provisions of a Commission Order entered on February 1, 1996. Specifically, U S West requests review of the provision establishing a zero held orders standard for U S West in New Mexico and the provision prohibiting US WEST from charging the costs of alternative service programs to customers. We review the Commission's Order pursuant to Rule 12–102(A)(3) NMRA 1997, and hold that the contested provisions of the Order were lawful, just, and reasonable and will be enforced.

### II

2. U S WEST is a telecommunications service provider for a region that includes New Mexico and many other states. *See Attorney Gen. v. New Mexico State Corp. Comm'n (In re Rates & Charges of U S West Communications, Inc.),* 1996 NMSC 002 ¶ 2, 121 N.M. 156, 159, 909 P.2d 716, 719 (1995). U S WEST is governed by the New Mexico Telecommunications Act, NMSA 1978, Sections 63–9A–1 to –20 (1985, as amended through 1987), and is regulated by the Corporation Commission pursuant to Section 63–9A–5 (1985). The Commission is the department of government "charged with the duty of fixing, determining, supervising, regulating and controlling ... tele-

phone [utilities.]" NM Const. art. XI, § 7 (power of Corporation Commission over carriers). The Legislature has mandated that U S WEST "maintain the availability of access to telecommunications services at affordable rates." Section 63–9A–2 (1987) (purpose).

3. Fulfilling its obligation to regulate local telephone service providers in New Mexico, the Commission initiated this action to investigate the matter of U S WEST's failure to provide first telephone lines to customers within thirty days of receipt of a service request. The Commission was motivated to investigate U S WEST because a large number of New Mexicans were encountering delays of more than thirty days before having their first telephone line put in place. Ultimately, on February 1, 1996, the Commission entered the disputed Order. U S WEST filed a Petition for Removal on February 26, 1996. On March 12, 1996, this Court issued an Order Granting Intervention to the Attorney General. The Commission issued its Order of Removal on March 25, 1996, and U S WEST filed that Order in this Court on April 24, 1996.

4. U S WEST challenges the provision of the Commission's Order which imposes a statewide standard of zero primary orders held over thirty days, as well as the provision requiring that all costs associated with U S WEST's Service Guarantee Program and Service Alternative Program be booked below-the-line for rate making purposes. A held order is a customer request for a first telephone line which is not put in place within a specified number of days. *See, e.g., In re Request of U S WEST Communications, Inc. for a Limited Waiver of Section 22.903 of the Commission's Rules,* No. DA 96–605, 1996 WL 183140, at *4 (FCC April 17, 1996) (defining held order customers as "local exchange customers who have been waiting for installation of their first landline telephone service lines for seven or more days"). Booking below-the-line means that all costs associated with the relevant programs must be charged to U S WEST shareholders rather than to U S WEST ratepayers. *See* National Association of Regulatory Utility Commissioners, NARUC Annual Report on Utility and Carrier Regulation 1987, 854

(1987) (defining below-the-line accounting as "expenses incurred in operation of utility that are charged to the investor not the ratepayer"); *see also, Request of U S WEST Communications,* 1996 WL 183140, at *2 (requiring below-the-line treatment of expenses generated by alternative service programs to protect ratepayers from subsidizing these alternative services).

5. U S WEST was given 90 days to comply with the Order's provisions. Under the Order, failure to ensure that all New Mexicans received their first telephone line within thirty days of entering their request could result in "additional investigations into the company's operations in this state as well as consideration of any and all appropriate penalties or remedies available under applicable law." U S WEST responded to the Order by requesting removal to the New Mexico Supreme Court.

### III

6. U S WEST contends that the Order's zero held orders standard is unlawful, unjust, and unreasonable because: (1) it is arbitrary and capricious in that it establishes a standard that cannot be met, and thus violates Appellant's right to due process of the law; (2) any attempt to meet the zero held orders standard will require large capital outlays without a mechanism for the recovery of the capital expenditures, amounting to an illegal taking; (3) the zero held orders standard applies only to U S WEST, thus denying U S WEST equal protection of the law; and (4) it is not based on satisfactory and substantial evidence. U S WEST further contends that the Order's provision requiring billing of the alternative service programs below-the-line is unlawful, unjust, and unreasonable because: (1) it is not supported by substantial evidence; (2) the Commission lacked jurisdiction to impose the penalty provision governing below-the-line treatment on U S WEST; and (3) a full rate case is required to make determinations about the exclusion of costs associated with the alternative service programs from U S WEST's rates. Both provisions of the Order are lawful, just, and reasonable, and will be upheld.

7. When presented with an Order entered by the Commission and removed to this Court, we are mandated to decide the case on its merits. *See* NM Const. art. XI, § 7; *In re Rates & Charges of U S West,* 1996 NMSC 002 ¶ 10, 121 N.M. 156, 909 P.2d 716. We must weigh the evidence in the record to "make an independent determination that it is more likely than not that the Commission's order is just and reasonable[,]" looking for satisfactory and substantial evidence to support the Commission's Order. *Burlington N. R.R. Co. v. Corporation Comm'n (In re Burlington N. R.R. Co.),* 107 N.M. 582, 584, 761 P.2d 855, 857 (1988) (citing *Missouri Pac. R.R. Co. v. State Corp. Comm'n (In re Missouri Pac. R.R. Co.),* 93 N.M. 753, 754, 605 P.2d 1152, 1153 (1980)). The term satisfactory refers to the weighing procedure. *Id.* Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *U S West,* 1996 NMSC 002 ¶ 10, 121 N.M. 156, 909 P.2d 716 (quoting *Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co., Inc.),* 114 N.M. 154, 156, 836 P.2d 73, 75 (1992)). In reviewing the record, we acknowledge the expertise of the Commission in public utility management, but will not make any presumptions in favor of the Commission's decisions. *See Burlington,* 107 N.M. at 584, 761 P.2d at 857.

A.

8. First we address U S WEST's contention that the zero held orders standard violates substantive due process by setting an arbitrary and unobtainable standard. A state commission, such as the Corporation Commission, is an instrumentality of the state, and its orders have the same force as statutes enacted by the legislature. *See Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n,* 262 U.S. 679, 683, 43 S.Ct. 675, 676, 67 L.Ed. 1176 (1923). We apply rational basis scrutiny, requiring the opponent of legislation to prove that the legislation lacks a reasonable relationship to a legitimate governmental purpose, to economic regulations such as the Commission's Order. *See Marrujo v. New Mexico State Highway Transp. Dep't,* 1994 NMSC 116 ¶ 12, 118 N.M. 753, 757–58, 887 P.2d 747, 751–52 (1994). We find that the zero held orders standard contained in the Order bears a reasonable relationship to a legitimate governmental purpose.

9. The zero held orders standard was intended to further the legitimate governmental purpose of motivating U S WEST to comply with the mandates of the New Mexico Telecommunications Act. *See* NMSA 1978, §§ 63–9A–1 to –20. Section 63–9A–2 of the New Mexico Telecommunications Act provides that "it remains the policy of the state of New Mexico to maintain the availability of access to telecommunications services...." The record supports the Commission's conclusion that U S WEST requires an incentive to provide access to telecommunications services in New Mexico. There is testimony that the number of held orders allowed by U S WEST is both excessive and avoidable. Reports show that in August, 1995, 557 New Mexicans were unable to obtain primary telephone service within thirty days of filing their request. Over one hundred of those customers waited more than 180 days for service. Given U S WEST's inadequate response to increasing demands for telecommunications services, the Commission's effort to motivate U S WEST to comply with the New Mexico Telecommunications Act is a legitimate governmental purpose.

10. We also find that the zero held order standard is reasonably related to the purpose for which it was designed. The Attorney General's expert witness, Weiss, specified that U S WEST's held order problem is the result of the company's flawed management, and that the problem can be alleviated by achieving accurate market growth predictions and deploying new technologies. Despite the costs associated with deploying these new technologies, Weiss testified that zero held orders for new service aged thirty days or more was a realistic and achievable objective. If fear of potential penalties motivates U S WEST to achieve the zero held orders standard, the Commission's goal of obtaining access to telecommunications services for New Mexicans would be accomplished. Thus, the zero held orders standard

is reasonably related to a legitimate governmental purpose.

11. Having weighed the evidence contained in this record, we are swayed by the testimony establishing the feasibility and desirability of a zero held orders standard. We conclude that the zero held orders standard is reasonably related to the legitimate government purpose of obtaining telecommunications services for New Mexicans. Implementation of the zero held orders standard does not offend due process. We uphold the Commission's Order based on satisfactory and substantial evidence in the record which establishes that the zero held orders standard is lawful, just, and reasonable.

### B.

12. The next issue presented by this appeal is whether the Commission's Order effectuates an illegal taking of U S WEST's property by requiring tremendous capital investments without providing a mechanism for recuperating those costs. Under U S WEST's arguments, the Commission Order requires capital investments in order to provide telecommunications service to applicants prior to the thirty day deadline. These investments are not economically feasible because they require the installation of telecommunications facilities across New Mexico in preparation for the possibility that a new customer might request telephone service in a remote part of the state. The infeasibility of such a demand is compounded by the Commission's refusal to allow U S WEST to recuperate the capital investments through rate increases. The end result is that the Order perpetrates an unlawful taking of U S WEST's property. We do not agree with this argument.

13. Private property may not be taken for public use without just compensation. U.S. Const. amends. V, XIV; NM Const. art. II, § 20. Yet, it is possible for a state to exercise police power in regulating a public utility without violating the Takings Clause. *See Railroad Comm'n Cases (Stone v. Farmers' Loan & Trust Co.),* 116 U.S. 307, 331, 6 S.Ct. 334, 344–45, 29 L.Ed. 636 (1886) (holding that state cannot regulate to extent of taking private property for public use

without just compensation and due process of law and recognizing that regulation is not necessarily taking); *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 112 N.M. 379, 385, 815 P.2d 1169, 1175 (1991) (noting existence of due process limitations on police power to regulate public utilities); *see also* 64 Am.Jur.2d *Public Utilities* § 9 (1972) ("A rightful exercise of the police power in the supervision of public utilities does not deprive them of their property without due process of law...."). In order to merit compensation under the Takings Clause, the regulation must impair the financial integrity of the utility. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922) (only where the exercise of a state's police powers results in impairment of a certain magnitude is there an exercise of eminent domain and the concomitant requirement of compensation); *Board of County Comm'rs v. Harris,* 69 N.M. 315, 318, 366 P.2d 710, 712 (1961) (noting requirement of material change in value and consequential damages to find compensable harm, emphasizing need for case by case evaluation and noting that where damage results from legitimate exercise of police power taking or compensable damage is unlikely). In applying this framework to the instant case, we find that no taking of property has occurred.

14. The record does not support U S WEST's claim that compliance with the Order would require crippling capital investments. U S WEST alleges that compliance with the Order would require the installation of telecommunication service facilities across the State, despite the absence of current demand for such facilities. This allegation fails in the face of provisions which exclude remote customers from coverage under the zero held orders standard. The Order on Stipulation, which operates in unison with the Order, specifies that for customers in remote areas (not in the "Base Rate Area"), the thirty day held order standard would not apply. For example, U S WEST may provide service to customers outside the Base Rate Area within 90 days of their payment of line extension charges without violating the zero held order standard. The Stipulation further provided that "[o]rders outside the

base rate area which require a customer contribution in order to provide a line extension and for which the customer refuses or is unable to make the required contribution shall not be considered a held order." Line extensions are paid for by the customer under the following circumstances:

For line extensions in excess of one thousand (1000) feet from the nearest distribution terminal, the Rural Line Extension Fund shall be used to provide a maximum of $5000 to build new distribution plant in excess of the first 1000 feet for residence primary service only. Any amounts in excess of the $5000 shall be the responsibility of the customer.

Given that the zero held orders standard does not apply to many customers outside the Base Rate Area, U S WEST cannot accurately assert that construction of new facilities throughout New Mexico is mandated by the Order.

15. In addition, the Order on Stipulation provides a method by which U S WEST can obtain a waiver of the zero held orders standard for telephone service applications which cannot be met within the thirty day time frame due to unusual circumstances. The waiver provision specifies that, "[t]he Company shall have the right to petition the Commission for a waiver of the above specified timeframes due to unusual circumstances including but not limited to delays in obtaining necessary rights-of-way or other permits, weather delays, unreasonable costs, or additional time required for necessary construction." Thus, where new construction is required to provide telecommunications services, the thirty day time frame does not apply. According to testimony offered to this Court during oral arguments, U S WEST has always ultimately obtained approval of their waiver requests. The waiver provision further obviates the need to install telecommunication service facilities throughout New Mexico before demand renders installation of those facilities practical.

16. In light of the provisions excluding many rural applications from held order status, coupled with the ability of U S WEST to obtain a waiver when compliance with the zero held orders standard is infeasible, we conclude that U S WEST has not suffered a taking of property resulting from a requirement that U S WEST make unreasonable investments in telecommunication service facilities throughout New Mexico.

17. The next component of the Takings Clause argument raised by U S WEST addresses the Order's failure to provide for a rate increase to recuperate the costs associated with the capital expenditures required for compliance with the zero held orders standard. Having carefully studied the record, we find nothing prohibiting the Commission from approving a rate increase application authorizing U S WEST to recuperate these capital expenditures. The only specification about rate making contained in the record addresses the costs associated with providing alternative telephone services to customers. Under the Order, the cost of providing alternative service must be billed to the shareholders rather than the ratepayers in order to provide U S WEST with a proper incentive to comply with the zero held orders standard. The costs associated with installing additional telecommunication service facilities are not included in the below-the-line accounting provision of the Order.

18. Pursuant to the New Mexico Constitution, article XI, Section 7, U S WEST must apply to the Commission in order to obtain a rate increase necessitated by large capital expenditures. The Commission rather than this Court is the proper arbiter of all rate increase requests. *See General Tel. Co. of the Southwest v. Corporation Comm'n (In re General Tel. Co. of the Southwest)*, 98 N.M. 749, 753, 652 P.2d 1200, 1204 (1982); *see also New York ex rel. Woodhaven Gaslight Co. v. Public Serv. Comm'n*, 269 U.S. 244, 249, 46 S.Ct. 83, 85, 70 L.Ed. 255 (1925). The contested Order does not involve a rate increase application.

19. Finally, we note that the record before this Court lacks sufficient evidence to find that the zero held orders standard impairs the financial integrity of U S WEST. The references to the financial implications of the zero held orders standard include the inaccurate claim that a $1 billion dollar capital expenditure would be required to achieve compliance. In fact, the projected $1 billion

dollar capital expenditure is for improvement of the entire region's telecommunications services, involving service to approximately fourteen different states. The Order only demands implementation of the zero held orders standard in New Mexico, greatly reducing the estimated cost of compliance. Testimony presented to this Court during oral arguments indicates that approximately $75 million in capital investments might achieve the zero held orders standard. In addition, although the record contains no evidence of the detrimental impact of a large capital investment on the financial integrity of U S WEST, there was testimony that in the year 1995 capital spending for outside plants in New Mexico was projected to be $60.5 million, with an additional $8.8 million invested in inter-office facilities and $24.4 million for switch facilities. Additionally, Weiss testified that U S West would be able to comply with the Order "at low marginal cost relative to the revenue which would be generated from the new demand...."

20. Absent evidence of the financial impairment which will result from imposition of the zero held orders standard, and in light of the preceding discussion of the various components of U S WEST's Takings Clause argument, it is more likely than not that the Commission's Order imposing the zero held orders standard is supported by satisfactory and substantial evidence and is just, lawful, and reasonable.

### C.

21. U S WEST next alleges that the zero held orders standard is applied only to U S WEST, raising the question of whether the Order violates the Equal Protection Clause. U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."); NM Const. art II, § 18 ("No person shall be ... denied equal protection of the laws."). U S WEST contends that in compliance with the Equal Protection Clause the zero held orders standard must be applied to all similarly situated providers of telecommunications services in New Mexico. We disagree

with U S WEST's allegation that this Order perpetrates an equal protection violation.

22. Equal protection prohibits "the government from creating statutory classifications that are unreasonable, unrelated to a legitimate statutory purpose, or not based on real differences." *Madrid v. St. Joseph Hosp.*, 1996 NMSC 064 ¶ 35, 122 N.M. 524, 535, 928 P.2d 250, 261 (1996). An order which does not involve suspect classifications such as race, religion, or alienage, is presumed constitutional provided it is rationally related to a legitimate state interest. *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (classification must bear fair relationship to legitimate public purpose); *Thompson v. McKinley County*, 112 N.M. 425, 429–30, 816 P.2d 494, 498–99 (1991) (equal protection prohibits statutory classifications which are unreasonable or unrelated to statutory purpose). This Order does not implicate a suspect classification. We uphold the Order because it does not violate equal protection guarantees.

23. The threshold question in evaluating an equal protection claim is whether the legislation, or in this case the Order, results in dissimilar treatment of similarly-situated individuals. *See Madrid*, 1996 NMSC 064 ¶ 35, 122 N.M. 524, 928 P.2d 250. The evidence in the record shows that U S WEST has a history of excessive held orders which are increasing "due to the Company deliberately under-funding the state for growth and by an overly optimistic attitude regarding its re-engineering program." The record also reflects that U S WEST has maintained as many as 1,190 held orders. The record was devoid of evidence demonstrating that other telecommunications service providers have such severe held order problems. Thus, we cannot conclude that U S WEST and other telecommunications service providers are similarly situated.

24. The equal protection claim fails because there is no evidence to establish the existence of similarly situated telecommunications service providers. It is more likely than not that the Commission's Order imposing the zero held orders standard on U S WEST is supported by satisfactory and sub-

stantial evidence and is just, lawful, and reasonable.

### D.

25. U S WEST next argues that the Order's zero held orders standard is unsupported by satisfactory and substantial evidence. U S WEST argues that no evidence was presented to the Commission regarding the establishment of a standard which, if violated, could expose U S WEST to penalties. According to U S WEST, only the testimony of Weiss and the Commission's expert witness, Solomon, could be read to support imposition of the zero held orders standard. U S WEST contends that Weiss' testimony addresses implementation of a benchmark rather than a standard. U S WEST understands a benchmark to be a target range which, if not met, might result in further investigation. U S WEST understands a standard to be a specific level of held orders which, if not met, would result in penalties. U S WEST asserts that: (1) Weiss explicitly declined to recommend a standard; (2) Solomon actually recommended that a range of 100–200 held orders be tolerated prior to launching an investigation into the held order situation; and (3) no testimony suggested that exceeding the recommended range should subject U S WEST to penalties for failing to meet that range. U S WEST concludes that substantial and satisfactory evidence is lacking from the record to support the zero held orders standard. We disagree.

26. U S WEST points out that Weiss, in discussing the appropriate requirements to impose on U S WEST, utilized the term benchmark rather than standard. On this basis they argue that there is insufficient evidence to support imposition of the zero held orders standard. It is true that Weiss used the term "benchmark" rather than "standard." Yet, when taken in context, Weiss' testimony about benchmarks and standards clearly indicates that he is suggesting use of a zero held orders standard. Weiss' recommendation is that U S WEST be investigated and/or penalized for denying New Mexicans primary telephone service for more than thirty days and that "[t]he only

meaningful measure of success in meeting new service demand is to maintain a balance of zero (0) held orders aged 30 days or more." Weiss further testified that it was realistic to set a zero held orders objective, and he was unable to fathom a scenario in which U S WEST would be unable to meet the zero held orders standard with low costs relative to the revenues generated, through implementation of proper technology and forecasting. This testimony directly supports the Commission's implementation of a zero held orders standard, the violation of which will result in further investigation and the possibility of penalties. We conclude that the record contains satisfactory and substantial evidence to support the Commission's Order imposing a zero held orders standard on U S WEST.

### E.

27. We turn next to consideration of the second provision challenged by U S WEST. That provision requires below-the-line accounting for the alternative service programs. The Service Alternatives Program was established to provide a temporary service alternative to customers waiting for installation of their first telephone line. These services include cellular telephone service, free Voice Messaging Service, Remote Call Forwarding, and a waiver of installation charges once service is established. The Service Guarantee Program provides credits to customers receiving inadequate service.

28. We are unconvinced by U S WEST's assertion that there is insufficient evidence supporting the below-the-line accounting provision. U S WEST notes that the Commission received testimony that costs incurred by a business, such as expenses for provision of services, are characterized as ordinary and necessary expenses of business operations and that ordinary and necessary expenses are generally charged above-the-line to ratepayers. *See Mountain States Tel. & Tel. Co. v. Corporation Comm'n (In re Rates & Charges of Mountain States Tel. & Tel. Co.),* 99 N.M. 1, 6, 653 P.2d 501, 506 (1982) (noting that necessary or prudent expenditures for essential services are chargeable to ratepayers, while disallowing charges to ratepayers for expenditures for unnecessary services).

U S WEST contends that application of standard accounting rules, such as those used by the FCC, requires above-the-line treatment of the alternative service programs.

. 29. In reviewing the record we find satisfactory and substantial evidence that the costs of U S WEST's alternative service programs do not reflect ordinary costs of doing business, and should be charged below-the-line. *Id.* (noting impropriety of charging unnecessary expenses to ratepayers). The Commission's decision was founded in part on two witnesses who testified that costs associated with the Service Guarantee Program and the Service Alternative Program were not ordinary and necessary expenses billable above-the-line. Both witnesses testified that the Commission is not required to adopt accounting rules which classify such expenses as ordinary and necessary. We have previously held that "the Commission is not bound by the accounting procedures established by the FCC." *Id.* at 11, 653 P.2d at 511. Even the FCC has required U S WEST to account for alternative services below-the-line. *See Request of U S WEST Communications,* 1996 WL 183140 at *18 (requiring that billing reflect the costs of alternative cellular services offered to held order customers as below-the-line in order to encourage U S WEST to avoid reliance on the cellular services).

30. Weighing the evidence contained in the record, we find satisfactory and substantial evidence to support the Commission's Order requiring U S WEST to charge the costs associated with failure to comply with the zero held orders standard below-the-line. The Commission's Order is lawful, just, and reasonable.

### F.

■ 31. U S WEST views the Order's below-the-line provision as a penalty which the Commission is without authority to levy. *See* NMSA 1978, § 63–7–23 (1995) (defining legitimate administrative fines for application to telecommunications utilities). We disagree with U S WEST's classification of the provision as a penalty. The below-the-line accounting method is not inherently harmful to U S WEST. In fact, by encouraging U S

WEST to provide telephone service promptly, U S WEST will increase the number of income generating ratepayers. The intent behind the below-the-line accounting requirement was to motivate U S WEST to ensure that customers had access to telecommunications services. The provision requiring the costs of these programs to be charged to shareholders rather than ratepayers is an appropriate incentive, and is legitimate in a non-rate-making proceeding. *See, e.g., Request of U S WEST Communications, Inc.,* 1996 WL 183140, at * 18 (ordering below-the-line treatment of cellular service available to held order customers in effort "to encourage U S WEST from relying any more than necessary on this program as a substitute for building and maintaining its wireline network"); *cf. General Tel. Co. of the Southwest,* 98 N.M. at 758, 652 P.2d at 1209 (noting that Commission has no authority to reprimand utility for poor quality of service through punitive measures in rate making proceeding). Thus, the Commission did not impose a penalty on U S WEST through inclusion of the provision requiring below-the-line treatment of the costs associated with the alternative service programs. *See Request of U S WEST Communications, Inc.,* 1996 WL 183140, at * 18 (requiring below-the-line treatment of expenses generated by U S WEST's resale of cellular service as an incentive rather than a penalty). Once again, we find that it is more likely than not that the Commission's Order requiring below-the-line treatment of the alternative service programs is supported by satisfactory and substantial evidence and is just, lawful, and reasonable.

### G.

■ 32. Finally, U S WEST contends that the Commission must conduct a rate making hearing before ordering below-the-line treatment of the charges for the alternative service programs. U S WEST did not object to the Commission's request for evidence on the merits of below-the-line treatment of the costs associated with the alternative service programs. In fact, U S WEST provided the Commission with testimony and briefing addressing the impropriety of below-

the-line accounting for the alternative service programs and failed to object to the Commission's consideration of this issue. Issues not raised at the time of an administrative proceeding before the Commission will not be considered by this Court on appeal. *See Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 189, 668 P.2d 303, 305 (1983). Therefore, we will not address this issue.

### IV.

33. U S WEST has failed to show that the contested provisions of the Order are unjust, unreasonable, or unlawful. We find substantial and satisfactory evidence in the record establishing that the zero held orders standard: (1) does not violate the protections of substantive due process; (2) does not effectuate a taking of property without just compensation; (3) is not violative of equal protection; and (4) is supported by satisfactory and substantial evidence. In addition, we find that the provision requiring below-the-line treatment of the alternative service programs: (1) is supported by satisfactory and substantial evidence; and (2) does not constitute an unauthorized penalty. Therefore, we affirm the Order of the Commission.

34. **IT IS SO ORDERED.**

MINZNER and McKINNON, JJ., concur.