STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND THE PUBLIC STAFF v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY

No. 408A82

(Filed 8 February 1983)

**1. Telecommunications § 1.2— telephone rates—revenues from advertising in yellow pages**

    The Utilities Commission has the authority to include, in a telephone company's operating statistics for the purpose of ratemaking, the investments, the cost and the revenues related to the company's directory advertising operation. The telephone company enjoys a great advantage over all competitors in the field of directory advertising, and this preferred position with all its benefits and revenues is directly related to and a result of the company's public utility function. G.S. 62-30, G.S. 62-32, and G.S. 62-3(23)d.

2. **Appeal and Error § 9; Telecommunications § 1.7— rate of return question neither moot nor confiscatory**

> The Court of Appeals erred in holding that a rate of return on common equity question was mooted by virtue of later rate increases; however, a 13.5% rate of return on common equity was not confiscatory in violation of our State and Federal Constitutions where the Commission's determination of a fair rate of return was supported by competent evidence.

> Justices MARTIN and FRYE did not participate in the consideration or decision of this case.

> Justice EXUM dissenting in part and concurring in part.

APPEAL as of right by Southern Bell Telephone and Telegraph Company (hereinafter "Southern Bell") pursuant to G.S. 7A-30(3) from a decision of the Court of Appeals (*Judge Wells* with *Judge (now Justice) Harry C. Martin* and *Judge Whichard* concurring), 57 N.C. App. 489, 291 S.E. 2d 789 (1982) affirming an order of the North Carolina Utilities Commission (hereinafter the "Commission") in a general ratemaking case. The proceeding before the Commission is identified as Docket No. P-55, Sub 784.

On 4 September 1980 Southern Bell filed an application for an adjustment in its rates and charges for local and intrastate toll telephone service pursuant to G.S. 62-130 *et seq.* The application requests increases in the amount of $110,333,040. However, in order to comply with voluntary inflation guidelines in effect at that time the proposed rates were designed to raise only an additional $68,174,088. These new rates were to become effective 4 October 1980. On 26 September 1980 the Commission determined, *inter alia,* that the application constitutes a general rate case under G.S. 62-137, and suspended the proposed adjustment in rates for a period of 270 days from 4 October 1980. The Commission ordered public hearings on the proposed adjustments and set out a schedule for those public hearings to be conducted during the months of December 1980 and January 1981. In addition the Commission set as the test period the twelve months period ending 31 July 1980.

On 3 April 1981, the Commission issued an order which granted a partial increase in Southern Bell's rates. In the order of 3 April 1981 the Commission disallowed $26,893,088 of the increase requested while allowing an increase of $41,281,000. In finding of fact number nine within the order of 3 April 1981, the

Commission found that the revenues, expenses and net operating income of the directory advertising operation are properly includable in the cost of service. In addition the Commission stated in finding of fact number ten that Southern Bell could earn a return on its common equity of up to 13.5%.

While this case was pending appeal in the North Carolina Court of Appeals, the Commission, on 3 March 1982, entered an order granting Southern Bell an additional annual rate increase of $66,835,744. In this same order the Commission approved a rate of return on common equity of 15.5%.

Southern Bell appealed to the North Carolina Court of Appeals from the Commission's order of April 1981. In an opinion filed 1 June 1982, the Court of Appeals concluded that the Commission acted properly by including the revenues, expenses and net operating income of Southern Bell's directory advertising operation in its ratemaking proceeding. The Court of Appeals also concluded that the 3 March 1982 rate increase allowed Southern Bell by the Commission renders the fair rate of the return issue moot.

Southern Bell filed notice of appeal in this Court on 6 July 1982 and oral arguments were heard 8 November 1982.

*Thomas K. Austin for the North Carolina Utilities Commission, Public Staff, intervenor-appellee.*

*Hunton and Williams by Robert C. Howison, Jr., R. Frost Brannon, Jr., Robert W. Sterrett, Jr., and Gene V. Coker, for Southern Bell Telephone and Telegraph Company, defendant-appellant.*

COPELAND, Justice.

This appeal presents two issues for consideration: (1) May the Commission through its ratemaking and supervisory authority include in Southern Bell's operating expenses and revenues for ratemaking purposes those expenses, revenues and investments relating to its directory advertising operations (commonly referred to as the Yellow Pages)? We conclude that the Commission may include those expenses, revenues and investments, arising from directory advertising, in ratemaking proceedings. (2) Was the Court of Appeals incorrect in treating as moot Southern Bell's

claim that the Commission's determination granting a 13.5% rate of return on common equity is arbitrary, unreasonable and confiscatory in violation of our State and Federal Constitutions? Although the Court of Appeals was incorrect in determining that the fair rate of return issue was moot, the established rate of return on equity of 13.5% is not in violation of either the State or Federal Constitutions.

[1] The first issue raised by the appellant, Southern Bell, concerns whether the Commission has the authority to include, in the Company's operating statistics for the purpose of ratemaking, the investments, the costs and the revenues relating to Southern Bell's directory advertising operation. Southern Bell vigorously argues that the Commission does not possess the necessary authority to include within the rate base the expenses and revenues from its directory advertising operation because that operation is not an essential part of the public utility function of providing telecommunications service. In support of this position Southern Bell points out that the actual transmission of messages across telephone lines does not rely on the yellow pages being available. Although Southern Bell is technically correct in its contention that actual transmission of messages across telephone lines is not dependent on the existence of the yellow pages, such an interpretation of the public utility function is far too narrow. Southern Bell's utility function is to provide adequate service to its subscribers. To suggest that the mere transmission of messages across telephone lines is adequate telephone service is ludicrous.

We wish to point out that the yellow pages have never been and are not now regulated by the Utilities Commission. However, the fact that a specific activity of a utility is not regulated does not mean that the expenses and revenues from that activity cannot be included in determining the rate structure of the utility. In fact, the revenues and expenses from directory advertisements have historically been included in ratemaking determinations in this state.

The Supreme Court of New Mexico was recently faced with this very issue and concluded that the "revenues, expenses and investments related to directory advertising" should be included in rate determinations. *Mountain States Telephone and Telegraph*

*Company v. Corporation Commission,* 653 P. 2d 501, 506 (N.M. 1982). In addition to New Mexico, thirty states plus the District of Columbia include directory advertising revenues in ratemaking proceedings. 127 *Cong. Rec.* S11139-40 (Daily Ed. October 6, 1981).

It is true, as Southern Bell points out, that the Utilities Commission possesses only those powers granted it by the legislature. *State ex rel. Utilities Commission v. General Telephone Co.,* 281 N.C. 318, 189 S.E. 2d 705 (1972). Through G.S. 62-30 and G.S. 62-32 the legislature has granted the Commission "such general power and authority to supervise and control public utilities of the State as may be necessary. . . ." G.S. 62-30. "The Commission is hereby vested with all power necessary to require and compel any public utility to provide and furnish . . . reasonable service of the kind it undertakes to furnish and fix and regulate the reasonable rates and charges to be made for such service." G.S. 62-32(b).

Although G.S. 62-30 and G.S. 62-32 appear to provide the Commission with ample authority to include directory advertising in ratemaking proceedings, Southern Bell argues that G.S. 62-3(23)d limits that authority by providing: "If any person conducting a public utility shall also conduct any enterprise not a public utility, such enterprise is not subject to the provisions of this Chapter." § 62-3(23)d. In response to this contention we simply point out that the directory advertising operation of Southern Bell is not a separate enterprise from the transmission of telephone messages. The yellow pages are a very useful and beneficial component in providing telephone service to the public. In fact as Southern Bell points out on Page 137 in its February 1982, Raleigh, North Carolina Yellow Pages, "4 out of 5 [adults] Look in the Book." On page 265 of that same book we find that every year the yellow pages are referred to "a total of almost 3.69 *billion* times." Indeed, the yellow pages are more than a convenience to newcomers in town who need a doctor, lawyer, plumber, electrician or any number of services. Newcomers could not be expected to begin in the front of the alphabetical listings and search until they find the desired service. In fact Southern Bell uses that very situation to promote the sales of its advertisements, "Let newcomers get acquainted with you — Include all of your lines in these Yellow Pages." P. 202 of 1982 Raleigh, North Carolina Yellow Pages.

Southern Bell contends that since the yellow pages were not available in all of its exchanges until 1955, it must not be essential to adequate telephone service. However, the Commission, in discussing the evidence presented relating to this question, stated "The classified directory in which advertising appears, is an *integral part* of providing adequate telephone service." "On the Appeal to the Superior Court the Commission's findings of fact are conclusive and binding if they are supported by competent, material, and substantial evidence in view of the entire record." *State ex rel. Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 454, 130 S.E. 2d 890, 894 (1963). There was ample evidence before the Commission to support the inclusion of the expenses and revenues from directory advertising in the ratemaking process.

Southern Bell further argues that inclusion of revenues and expenses from directory advertising is unfair in light of the competition it faces from newspapers, magazines, pamphlets and other classified directories. The Commission answered this contention by stating, "competitive pressures may eventually be a factor in the marketing of directory advertising by Southern Bell . . . however, based on the evidence presented there is presently no substantial competition posing a threat to Southern Bell's advertising market in North Carolina." We agree there is no real competition. In its areas of service Southern Bell commands an unmatchable position by being able to guarantee that every subscriber of telephone service will receive the advertisement since the Company is required to provide an alphabetical listing (white pages) to all of its telephone subscribers. In addition, unlike any competitor, Southern Bell is able to place those advertisements with or within the same book in which the required alphabetical listing is carried.

The result is clear. Southern Bell enjoys a great advantage over all competitors in the field of directory advertising. In addition, this preferred position with all its benefits and revenues is directly related to and a result of the Company's public utility function. For these reasons we agree with the Utilities Commission and the Court of Appeals that the Commission does have the authority to include the expenses, revenues and investments related to directory advertising in its ratemaking proceedings.

Southern Bell argues that allowing the Commission the authority to include the expenses and revenues related to directory advertising in ratemaking proceedings is contrary to our holding in *Gas House, Inc. v. Southern Bell Telephone Co.,* 289 N.C. 175, 221 S.E. 2d 499 (1976). In *Gas House* this Court held that, "The business of carrying advertisements in the yellow pages of its directory is not part of a telephone company's public utility business." 289 N.C. at 184, 221 S.E. 2d at 505. The *Gas House* case concerned the validity of an exculpatory clause in a contract for the publication of an advertisement within the yellow pages. Although the above language is no more than *obiter dictum,* it is not inconsistent with the result we reach today. To the extent that the language in *Gas House* is inconsistent with our holding in the case *sub judice* that language is overruled. This language does not go so far as to say that the furnishing of a classified listing of subscribers, like that found in the yellow pages, to its customers is not an integral part of the public utility's function of providing adequate telephone service to the citizens of North Carolina. In fact, that is exactly what the Commission found in finding of fact number nine. We therefore uphold the inclusion of the expenses, revenues and investments related to directory advertising in the ratemaking process. We also note that under G.S. 62-42(5) the Commission has the authority to order the utility to take action necessary to secure reasonably adequate service for the public's need and convenience. Undoubtedly yellow pages could fall within this provision.

[2] The second issue raised by Southern Bell is whether it was incorrect for the Court of Appeals to hold that its claim that a 13.5% rate of return on common equity is confiscatory in violation of our State and Federal Constitutions was moot by virtue of a later rate increase. The Court of Appeals, in our view, was mistaken and the question of whether 13.5% is a confiscatory rate of return on common equity is not moot.

In its opinion the Court of Appeals relied on *Utilities Commission v. Southern Bell Telephone Company,* 289 N.C. 286, 221 S.E. 2d 322 (1976), in holding that the issue concerning a fair rate of return on common equity becomes moot by a subsequent rate increase. We believe that the Court of Appeals has misconstrued the meaning of *Utilities Commission v. Southern Bell Telephone Company, supra,* as it applies to this case. The primary error in

rendering Southern Bell's claim moot is that the question to be considered in this case arises out of a general ratemaking case, docket number P-55 Sub 784, while the subsequent rate hike in March of 1982, almost a year after the Commission's order was filed in the original case, is from docket number P-55 Sub 794 which relates to a different time frame. The later rate increase does not cover entirely that period of time covered by the original general rate case. This must be true since rates are set prospectively and not retroactively. Therefore, the original rate case must be fully and finally decided by the courts. Under these circumstances the issue in the case *sub judice* of whether a 13.5% rate of return on common equity is a fair rate of return must be considered.

Before determining the question of whether 13.5% is a confiscatory rate of return under our Federal and State Constitutions we emphasize that it is the Commission, not the Courts, which is authorized by the legislature to determine what is a fair rate of return. *Utilities Commission v. Duke Power Company*, 285 N.C. 377, 206 S.E. 2d 269 (1974); *Utilities Commission v. Va. Electric and Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974). Therefore, we cannot and will not substitute our judgment of what is a fair rate of return for the judgment of the Commission. *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (1982). "Rates fixed by the Commission are deemed *prima facie* just and reasonable." *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 10, 287 S.E. 2d 786, 792 (1982). See also G.S. 62-94(e). As a result, in reviewing the Commission's determination of a fair rate of return, this Court will only review the record and the evidence to determine if the Commission's order is supported by competent evidence.

The Commission heard testimony from five distinguished experts concerning a proper rate of return on common equity for Southern Bell. This testimony was recapitulated by the Commission in its "Evidence and Conclusions For Finding of Fact No. 10" beginning on Page 586 and continuing through Page 592 of the record. Within these pages, among other things, the Commission set out the final recommendations of four of the five experts who employed the "discounted cash flow" analysis for determining proper rate of return. The results as set out in the record are:

State ex rel. Utilities Comm. v. Southern Bell

| *Witness* | *Final Recommendation* |
|-----------|------------------------|
| Carleton | 16.0 - 16.5% |
| Langsam | 13.5 - 14.0% |
| Vander Weide | 16.0 (17.5%) |
| Watson | 13.5% |

As can be seen from this chart, the Commission's final determination of 13.5% is the exact rate recommended by witness Watson and is within the range of recommendation of witness Langsam. The other two witnesses, Carleton and Vander Weide testified on behalf of Southern Bell. Perhaps one reason for their significantly higher recommendations, other than their ties to Southern Bell, is that each one treated Southern Bell as an industry that is as risky an investment as any other industry. The Commission within its conclusions stated that it could not accept the argument that a company like Southern Bell is as risky an investment as those industries which are subject to the pressures of competition.

As we stated most recently in an opinion written by Justice Meyer:

> It is well settled that the credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or in part the testimony of any witness. While an administrative body must consider all of the evidence and may not disregard credible undisputed evidence, it is not required to accept particular testimony as true.

*State ex rel. Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 21, 287 S.E. 2d 786, 798 (1982). It is clear from the record that the Commission weighed all the evidence presented before reaching a conclusion. It is also clear that the Commission gave greater weight to the testimony of the witnesses not associated with Southern Bell. However, as Justice Meyer wrote:

> An expert's opinion testimony may be given less credibility and therefore minimum consideration when the expert is friendly or sympathetic to the party on whose behalf he is testifying. The opinion of the expert may simply be intrinsically non persuasive even though it is uncontradicted.

*State ex rel. Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 23, 287 S.E. 2d 786, 799. If the Commission may refuse to accept the uncontradicted evidence presented to it by a utility, it most certainly may reject the utility's evidence in favor of evidence presented by other witnesses. That is exactly the circumstance in this case.

Such an action by the Commission is even more understandable in light of the fact that, unlike the utility, the Commission must balance the needs and interests of the utility with the needs and interests of the public. G.S. 62-133(b)(4).

Considering the evidence presented to the Commission, the fact that two witnesses recommended a rate of return consistent with 13.5% and the fact that the Commission must strike a balance between the needs of the utility and the needs of the public, we must conclude that the Commission's determination that a 13.5% rate of return on common equity is a fair rate of return, is not arbitrary and capricious and is not confiscatory in violation of Article I, Section 19 of the North Carolina Constitution or the United States Constitution.

We therefore hold that the action taken by the Commission is not arbitrary and is sufficiently supported by the evidence. The opinion of the Court of Appeals is modified in part and affirmed.

Modified and affirmed.

Justices MARTIN and FRYE did not participate in the consideration or decision of this case.

Justice EXUM dissenting in part and concurring in part.

I dissent from so much of the majority opinion which holds that the Utilities Commission correctly concluded that yellow page advertising was an integral part of providing adequate telephone service so that revenues from this advertising are properly considered in setting rates for the utility. Even if such a conclusion now constitutes good rate making policy because, as the Commission found, Southern Bell presently has a monopoly on such advertising, the monopoly, if it exists, is *de facto* and not *de jure*. This Court, concededly in a different context, nevertheless held that "the business of carrying advertisements in the yellow

pages of its directory is not a part of a telephone company's public utility business." *Gas House, Inc. v. Southern Bell Tel. Co.*, 289 N.C. 175, 184, 221 S.E. 2d 499, 505 (1976). This statement is not dictum as I read the case; it is a necessary conclusion to the decision in the case sustaining Southern Bell's limitation of liability clause in a contract for yellow page advertising. To "overrule" this language in *Gas House* is, in effect, to overrule the decision in that case. I cannot subscribe to the majority's rather cavalier attitude to precedents of this Court with which it now disagrees. If such advertising is not a part of the company's public utility business, as we held in *Gas House,* then it is not subject to regulation and revenues derived from it are not properly considered in setting rates for the public utility services which the company provides. G.S. 62-3(23)d.

I also disagree with the majority's conclusion that the question whether the utility's rate of return allowed by the Commission was so low as to be confiscatory is not moot. Because our ruling in its favor on this question could provide no relief for the utility in this proceeding, I think it is moot under *Utilities Commission v. Southern Bell Tel. Co.*, 289 N.C. 286, 221 S.E. 2d 322 (1976). Even if moot, this Court may, if it chooses, consider the question on the basis that it is a question of general importance, likely to recur in future rate making cases, and deserving of prompt resolution. *Leak v. High Point City Council,* 25 N.C. App. 394, 213 S.E. 2d 386 (1975); *Matthews v. Dep't of Transportation,* 35 N.C. App. 768, 242 S.E. 2d 653 (1978); *see also Netherton v. Davis,* 234 Ark. 936, 355 S.W. 2d 609 (1962); *Walker v. Pendarvis,* 132 So. 2d 186 (Fla. 1961); *Payne v. Jones,* 193 Okla. 609, 146 P. 2d 113 (1944); 5 CJS, Appeal and Error, § 1354(1) (1958).

The utility argues that because the rate of return allowed on its equity is less than that which it earns on its bonds, the equity rate of return is confiscatory. This kind of question is one properly addressable by this Court even if our answer to it can provide no relief to the utility in this proceeding. I agree with the majority's decision to take up the question and with the majority's conclusion that the rate of return on equity was not confiscatory simply because the rate was lower than the yield on the utility's bonds. I further agree there was ample evidence in the record to support the rate of return allowed by the Commission.