344 S.E.2d 46 (1986)
In the Matter of the Proposed Assessment of Additional Franchise Tax for the Taxable Quarters Ended March 31, 1980, June 30, 1980 and September 30, 1980 by the SECRETARY OF REVENUE OF NORTH CAROLINA
v.
CAROLINA TELEPHONE AND TELEGRAPH COMPANY.
No. 8510SC1243.
Court of Appeals of North Carolina.
June 3, 1986.
*47 Atty. Gen. Thornburg by Sp. Deputy Atty. Gen. Myron C. Banks, Raleigh, for petitioner-appellant.
Dwight W. Allen, Vice President, Secretary and Gen. Counsel, Carolina Tel. & Tel. Co. and Taylor & Brinson by Herbert H. Taylor, Jr., Tarboro, for respondent-appellee.
EAGLES, Judge.
The sole question presented for review is whether the revenues received by Carolina *48 from the sale of advertisements to appear in the "yellow page" classified directory are includable as "gross receipts" of a telephone company for franchise tax purposes as defined in G.S. 105-120. We find that they are not and accordingly affirm.
G.S. 105-120(b) imposes an annual franchise tax, payable quarterly, on the "gross receipts" of a telephone company. A telephone company is "[e]very person, firm, or corporation, domestic or foreign, owning and/or operating a telephone business for the transmission of messages and/or conversations to, from, through, in or across this State." G.S. 105-120(a). "Gross receipts" are defined in subsection (b): "Such gross receipts shall include all rentals, other similar charges, and all tolls received from business which both originates and terminates in the State of North Carolina." This definitional portion of the statute determines this appeal. Our decision turns on the legislative intent and meaning of the phrase "rentals, other similar charges, and all tolls received from business."
In construing G.S. 105-120(b) we are guided by two general legal principles. First, we must determine the connotation which the legislature attached to the words used to define "gross receipts," construing the statute as the legislature intended it to be understood when it was enacted. Cab Co. v. Charlotte, 234 N.C. 572, 68 S.E.2d 433 (1951). Second, we must construe tax statutes strictly, resolving ambiguities against the State and in favor of the taxpayer. Watson Industries v. Shaw, Comr. of Revenue, 235 N.C. 203, 69 S.E.2d 505 (1952).
The statute declares that gross receipts shall include rentals, other similar charges and all tolls received from business. In the only North Carolina case interpreting the statutory definition of "gross receipts," Telephone Co. v. Clayton, Comr. of Revenue, 266 N.C. 687, 147 S.E.2d 195 (1966), our Supreme Court held that telephone pole rentals charged by Southern Bell to electric power companies and other users of its poles were not the type of "rentals" contemplated in the statutory definition of "gross receipts." Id. at 692, 147 S.E.2d at 198. Therefore the Commissioner of Revenue could not include those rentals in computing Southern Bell's franchise tax base. Id. The Court determined that "rentals" meant rentals paid by customers for the use of telephone, i.e. local exchange rentals. Id. at 691, 147 S.E.2d at 197. In its analysis of the statute, the Clayton court came to the following conclusions:
(1) At the time G.S. 105-120(a) and (b) was enacted in 1939, the word rental referred to the rental of the telephone itself. Charges similar to "rentals" were "monthly charges for special equipment such as outdoor sets, hand telephones, and extra lengths of cord for desk sets.... colored sets, `push-button dialing,' amplifiers and other accouterments." Id. at 690-91, 147 S.E.2d at 197.
(2) The General Assembly used the word "include" to mean "shall consist of" so as to not broaden the tax base but exclude interstate tolls from the tax base. Id. at 691, 147 S.E.2d at 197.
(3) If the General Assembly had intended to tax telephone companies' revenues from sources other than those services which telephone companies are obligated to furnish to the public, then the General Assembly would have specifically written the statute to include all receipts from any source whatsoever, excepting those expressly exempted. Id. at 691, 147 S.E.2d at 198.
Following the analysis used by the Clayton court, we conclude that revenues received from the sale of advertisements displayed in the "yellow page" classified directory are not includable in Carolina's franchise tax base. These receipts clearly do not represent "rentals" or "tolls received from business." "Rentals" are the amounts paid by telephone customers for local exchange rentals. 266 N.C. at 691, 147 S.E.2d at 197. "Tolls received from business" are the revenues received by Carolina from the telephone company business. A toll is defined as a sum of money paid for the use of something. Blacks Law Dictionary 1334 (rev. 5th ed. 1979). Telephone "business" is defined in G.S. 105-120(a) *49 as "the transmission of messages and/or conversations to, from, through, in or across this State." Therefore, "tolls received from business" are the charges paid to Carolina by its customers for the privilege of using Carolina's message transmission and communication equipment. This definition encompasses the transmission of messages and conversations but does not include revenues received from the sale of "yellow page" advertisements.
"Gross receipts" also include "other similar charges." This phrase appears in sequence immediately after the term "rentals:" "gross receipts shall include all rentals, other similar charges...." While the Court in Clayton, supra, did not specifically define "other similar charges," the Court alluded to a definition by stating: "Charges similar to these rentals ... were monthly charges for special equipment such as outdoor sets, hand telephones, and extra lengths of cord for desk sets. Today extra charges are made for colored sets, `push-button dialing,' amplifiers and other accouterments." 266 N.C. at 690-91, 147 S.E.2d at 197. In determining what is meant by the phrase "other similar charges" we are guided by the ejusdem generis rule of statutory construction, "where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including only things of the same kind, character and nature as those specifically enumerated." State v. Lee, 277 N.C. 242, 244, 176 S.E.2d 772, 774 (1970) (quoting State v. Fenner, 263 N.C. 694, 140 S.E.2d 349 (1965). Applying this rule we find that the phrase "other similar charges" means charges of the same kind and character as rentals, for example, the type of charges listed by the Supreme Court in Clayton. Revenues from the sale of advertisements to appear in the "yellow page" classified directory do not fall within this description. They are not rentals, defined by the Court in Clayton to be local exchange rentals and they are not of like kind, character and nature.
Accordingly, we hold that the General Assembly did not intend to include as "gross receipts" revenues attributable to the sale of advertisements displayed in the "yellow page" classified directory.
We note that the legislative history of the franchise tax statute supports our holding. As early as 1911, a specific tax was levied on telephone companies although not on a gross receipts basis. N.C. Public Laws 1911, ch. 50 Section 49. By 1913, the tax was levied on "gross receipts" from all sources. There was no limitation specifying the scope or content of the receipts. N.C. Public Laws 1913, ch. 201 Section 81. In 1925 it was first provided that "gross receipts shall include all tolls received from business which both originates and terminates in the State of North Carolina...," evincing a legislative intent to restrict the tax to gross receipts arising only from the telephone business. N.C. Public Laws 1925, ch. 101 Section 88. In 1929, the tax was first denominated a "franchise tax" and in that year assumed the general form it now takes. N.C. Public Laws 1929, ch. 345 Sections 201, 207. The "gross receipts" tax began as a tax on gross receipts from all sources. It was later limited to a tax on receipts from the telephone business. Subsequently it was specifically defined as a tax on "rentals, other similar charges, and tolls received from business." G.S. 105-120(b).
We note too that the legislative policy behind franchise tax statutes generally supports our holding.
Franchise taxes are imposed for the privilege of engaging in business in this State. G.S. 105-114. The amount of the tax varies with "the nature and magnitude of the privilege taxed, the relative financial returns to be expected of the business or activities under franchise, and the burden put on government in regulating, protecting and fostering the enterprise...."
Clayton, supra, 266 N.C. at 690, 147 S.E.2d at 197 (quoting Power Co. v. *50 Bowles, 229 N.C. 143, 147, 48 S.E.2d 287, 290 (1948)). The annual franchise tax on telephone companies, G.S. 105-120(a), by its terms applies to "[e]very person, firm, or corporation ... owning and/or operating a telephone business for the transmission of messages and/or conversations" and is imposed "for the privilege of engaging in such business." G.S. 105-120(b). The telephone business is regulated by the North Carolina Utilities Commission pursuant to Chapter 62 of the General Statutes. G.S. 62-110 grants to a telephone company a monopoly on the rendering of telephone service within its service area. State ex rel. Utilities Comm. v. Merchandising Corp., 288 N.C. 715, 220 S.E.2d 304 (1975). "Nothing in Ch. 62 of the General Statutes, however, confers upon a telephone company a monopoly upon advertising by its business subscribers." Id. at 725, 220 S.E.2d at 310.
Though we resolve the issue before us on the basis of principles of statutory construction, two opinions by our Supreme Court, each relied on by one of the parties, warrant discussion here. Appellant urges that State ex rel. Utilities Comm. v. Southern Bell, 307 N.C. 541, 299 S.E.2d 763 (1983) (Southern Bell) requires reversal of the Superior Court's order. Appellee contends that Gas House, Inc. v. Southern Bell Telephone Co., 289 N.C. 175, 221 S.E.2d 499 (1976) (Gas House) supports the trial court's position.
Southern Bell, supra, was a ratemaking case in which the Court held that the Utilities Commission could consider the expenses, revenues and investments related to directory advertisements in its ratemaking proceedings. 307 N.C. at 547, 299 S.E.2d at 767. The Utilities Commission found as fact that "[t]he classified directory in which advertising appears, is an integral part of providing adequate telephone service." Id. at 546, 299 S.E.2d at 766. The Supreme Court held that there was sufficient evidence to support this finding of fact. Id.
Gas House, supra, concerned the validity of an exculpatory clause in a contract for the publication of an advertisement within the "yellow page" classified directory. The Supreme Court opinion noted that, "[T]he business of carrying advertisements in the yellow pages of its directory is not part of a telephone company's public utility business." 289 N.C. at 184, 221 S.E.2d at 505. In Southern Bell, supra, the Court's majority opinion distinguished Gas House and specifically stated that the above-quoted language from Gas House was obiter dictum and not inconsistent with the result reached by the Court in Southern Bell, but that "[t]o the extent that the language in Gas House is inconsistent with our holding in the case sub judice that language is overruled." 307 N.C. at 547, 299 S.E.2d at 766. Appellant here does not argue that Southern Bell overruled the quoted language from Gas House but merely refers to Justice Exum's dissent in Southern Bell disagreeing with the majority's designation of the Gas House language as obiter dictum and stating that by overruling the language in Gas House the Court, in effect, overruled the entire decision. 307 N.C. at 551, 299 S.E.2d at 768-69 (Exum, J., dissenting in part and concurring in part).
We have carefully reviewed the opinions in Gas House and Southern Bell and conclude that they are not inconsistent and may be read together. As we read it, Gas House holds that the business of carrying advertisements in the yellow pages is not part of a telephone company's public utility business. Southern Bell holds that the classified directory in which advertising appears, is an integral part of the public utility's function of providing adequate service to citizens of North Carolina. We read Southern Bell strictly to mean that, for ratemaking purposes, it is the furnishing of the classified directory which is integral to providing reasonable, adequate telephone service and not the additional advertisements that appear in the classified directory. In Southern Bell the distinction is recognized: "This language [in Gas House] does not go so far as to say that the furnishing of a classified listing of subscribers, like that found in the yellow *51 pages, to its customers is not an integral part of the public utility's function of providing adequate telephone service to the citizens of North Carolina." [Emphasis added.] 307 N.C. at 547, 299 S.E.2d at 766.
While we can reconcile the language of Gas House with the holding in Southern Bell, neither opinion directly addresses the issue of what constitutes Carolina's franchise tax base. Our decision here does not conflict with the policy expressed and the result reached by the Court in Southern Bell. The inclusion for ratemaking purposes of revenues from yellow page advertisements does not require that the revenues also be included in the public utility's franchise tax base. We note that while telephone pole rentals are included for ratemaking purposes, they too are excluded from the franchise tax base, Clayton, supra.
For the reasons stated, we affirm the trial court's order affirming the Tax Review Board.
Affirmed.
ARNOLD and PARKER, JJ., concur.