**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-1737**

———————

MONSANTO COMPANY,

                Plaintiff - Appellee,

     v.

ARE-108 ALEXANDER ROAD, LLC,

                Defendant - Appellant.

———————

**No. 14-1776**

———————

MONSANTO COMPANY,

                Plaintiff - Appellant,

     v.

ARE-108 ALEXANDER ROAD, LLC,

                Defendant - Appellee.

———————

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., Chief District Judge.  (1:10-cv-00898-WO-LPA)

———————

Argued:  September 15, 2015       Decided:  November 25, 2015

———————

Before DUNCAN and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Mark Everett McKeen, PAUL HASTINGS LLP, San Francisco, California, for Appellant/Cross-Appellee.  Jonathan Michael Watkins, MOORE & VAN ALLEN PLLC, Charlotte, North Carolina, for Appellee/Cross-Appellant.  **ON BRIEF**: Joseph H. Stallings, HOWARD, STALLINGS, FROM & HUTSON, P.A., Raleigh, North Carolina, for Appellant/Cross-Appellee.  Scott M. Tyler, MOORE & VAN ALLEN PLLC, Charlotte, North Carolina, for Appellee/Cross Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arises out of a commercial lease dispute between landlord ARE-108 Alexander Road, LLC (ARE-108) and tenant Monsanto Company (Monsanto). The first issue on appeal is whether the disputed lease provisions pertaining to Monsanto's obligation to pay rent are unambiguous. We find that the lease provisions are unambiguous and the district court properly granted summary judgment in favor of Monsanto. The second issue is whether North Carolina General Statutes § 6-21.2 authorizes Monsanto to recover attorneys' fees. We find that it does not, and therefore affirm the district court's judgment on this issue as well.

I.

ARE-108 and Monsanto became parties to a lease for commercial property located in Research Triangle Park, North Carolina after Monsanto assumed the lease from the prior tenant in March 2005.[1] The original lease term ran from November 1, 2000 to October 31, 2010. During this time, the tenant owed monthly Base Rent of $26,250, adjusted annually. Section 41 of the lease gave the tenant the right to extend the lease by two

---

[1] This lease is titled the "Phase 1B" lease. Monsanto and ARE-108 are also parties to two other leases for properties in Research Triangle Park; neither, however, is in dispute here.

3

five-year periods, during which no Base Rent would be payable.

Section 41 states:

> **Extension Rights.** Tenant shall have 2 consecutive rights . . . to extend the term of this Lease for 5 years each (each, a **"Term Extension"**) on the same terms and conditions as this Lease . . . . During any Term Extension, no Base Rent . . . shall be payable; all other Rent shall remain payable . . . .

J.A. 256. Together, the two Term Extensions spanned November 1, 2010 to October 31, 2020.

The lease contained an attorneys' fees clause stating that the prevailing party in a lease dispute would be entitled to recover "all reasonable fees and costs." J.A. 260.

In May 2005, shortly after Monsanto assumed the lease, Monsanto and ARE-108 executed the "First Amendment to Lease" (First Amendment), which amended various provisions of the lease but explicitly retained Monsanto's extension rights under Section 41:

> Except as expressly amended and modified hereby, all of the terms and provisions of the Lease shall remain unchanged and in full force and effect . . . . In addition, Landlord hereby confirms and agrees that Tenant shall have all of the Extension Rights under Section 41 of the Lease and that the Extension Rights are in full force and effect.

J.A. 319.

Approximately two years later, in November 2007, the parties executed a "Second Amendment to Lease" (Second Amendment) to "among other things, provide for additional

4

options to extend the Term . . . of the Lease." J.A. 329. The Second Amendment gave Monsanto the right to further extend the lease after it had exercised both Term Extensions:

> **Additional Right to Extend Term.** Following the exercise by Tenant of both of its existing 5-year extension options under Section 41 of the Lease . . . Tenant shall have 2 consecutive rights . . . to extend the Term of this Lease, consisting of 1 right to extend the Term of this Lease for a period of 10 years, and 1 final right to thereafter further extend the Term of this Lease for a period that expires on November 30, 2034 (each, an **"Additional Extension Term"**) on the same terms and conditions as this Lease (other than Base Rent) . . . .

Id. Together, the two Additional Extension Terms spanned November 1, 2020 to November 30, 2034.

During the Additional Extension Terms, Base Rent was to be determined by the "Market Rate," as follows:

> Upon the commencement of any Additional Extension Term, Base Rent shall be payable at the Market Rate (as defined below). Base Rent shall thereafter be adjusted . . . annual[ly] . . . by a percentage . . . . As used herein, **"Market Rate"** shall mean the then market rental rate as determined by Landlord and agreed to by Tenant, which shall in no event be less than the Base Rent payable as of the date immediately preceding the commencement of such Additional Extension Term increased by 103% multiplied by such Base Rent.

Id.

Thus, Base Rent at the beginning of each Additional Extension Term would be set at the Market Rate agreed to by the parties, which could be no less than 103% of the Base Rent payable immediately prior. Thereafter, Base Rent would increase

5

annually by a fixed percentage for the remainder of the Additional Extension Term. If the parties could not agree on the Market Rate, the matter would be submitted for arbitration.

Finally, the Second Amendment explained the relationship between its provisions and those of the original lease, stating:

> Except as amended and/or modified by this Second Amendment, the Lease is hereby ratified and confirmed . . . . In the event of any conflict between . . . this Second Amendment and . . . the Lease, the . . . Second Amendment shall prevail. Whether or not specifically amended by this Second Amendment, all of the terms and provisions of the Lease are hereby amended to the extent necessary to give effect to the purpose and intent of the Second Amendment.

J.A. 333.

In October 2009, Monsanto notified ARE-108 that it was exercising its right to the first Term Extension. ARE-108 sent Monsanto a Base Rent schedule for that Term Extension, to which Monsanto responded that it had no obligation to pay Base Rent pursuant to the lease. In November 2010, after the first Term Extension had commenced, ARE-108 declared Monsanto in default and threatened legal action. Monsanto responded by letter dated November 17, 2010 that it would pay the requested Base Rent "under protest," but reserved the right to be refunded and further reserved "all rights . . . under the Lease and applicable law to recover . . . attorneys' fees and costs." J.A. 44.

6

Monsanto then filed the instant suit seeking a declaration that it owed no Base Rent during the Term Extensions, the return of all Base Rent paid to ARE-108 under protest, and attorneys' fees. Shortly after ARE-108 served its first request for documents, Monsanto moved for summary judgment. ARE-108 opposed Monsanto's motion, arguing that the lease was ambiguous and ARE-108 should be permitted to obtain discovery regarding its proper interpretation under Federal Rule of Civil Procedure 56(d).

The district court, adopting the recommendation of the magistrate judge, found the lease to be unambiguous and granted Monsanto summary judgment. The district court issued a declaratory judgment stating that: (a) Monsanto had no obligation to pay Base Rent during the two Term Extensions; (b) Monsanto was not in default for failing to pay such Base Rent; (c) ARE-108 was not entitled to take any adverse action against Monsanto for failure to pay such Base Rent; and (d) Monsanto was entitled to the return of all Base Rent, late fees, and interest paid under protest to ARE-108. The district court awarded as monetary damages all Base Rent and related charges Monsanto had paid under protest and prejudgment interest, totaling $2,023,915.24. However, the district court denied Monsanto's request for attorneys' fees, finding that such fees were not authorized by North Carolina General Statutes § 6-21.2. ARE-108

7

appeals the district court's grant of summary judgment. Monsanto cross-appeals its denial of attorneys' fees.

## II.

We review the district court's grant of summary judgment de novo, World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992), and its denial of a Rule 56(d) request for discovery for abuse of discretion.[2] McCray v. Md. Dep't of Transp., Md. Transit Admin., 741 F.3d 480, 483 (4th Cir. 2014). In matters of contract interpretation, we have explained:

> Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence . . . . The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.

World-Wide Rights Ltd. P'ship, 955 F.2d at 245. If, instead, the contract is ambiguous, the court may evaluate extrinsic evidence to determine whether summary judgment is proper. Id.

---

[2] Rule 56(d) requires that summary judgment be refused when the nonmovant "has not had the opportunity to discover information that is essential to his opposition." Pisano v. Strach, 743 F.3d 927, 931 (4th Cir. 2014).

Under North Carolina law, "[p]arties can differ as to the interpretation of language without its being ambiguous."[3] Walton v. City of Raleigh, 467 S.E.2d 410, 412 (N.C. 1996). An ambiguity exists "when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Register v. White, 599 S.E.2d 549, 553 (N.C. 2004). Additionally, "[a] latent ambiguity may arise where the words of a written agreement are plain, but by reason of extraneous facts the definite and certain application of those words is found impracticable." Miller v. Green, 112 S.E. 417, 418 (N.C. 1922). With these principles in mind, we review the lease, as amended, to determine whether it is ambiguous as to Monsanto's obligation to pay Base Rent during the Term Extensions.

## III.

Section 41 of the lease granted the tenant two Term Extensions, together spanning 2010-2020, during which "no Base Rent . . . shall be payable." J.A. 256. The First Amendment affirmed that the Section 41 rights were "in full force and effect" when Monsanto assumed the lease. J.A. 319. ARE-108

---

[3] The parties appear to agree that North Carolina law governs the interpretation and enforcement of the lease and its amendments.

contends, however, that the Second Amendment implicitly revoked Monsanto's right to pay no Base Rent during the Term Extensions. Even assuming arguendo that two sophisticated companies would implicitly revoke a right worth millions of dollars, the Second Amendment cannot reasonably be read as doing so.

The Second Amendment granted Monsanto two Additional Extension Terms, together spanning 2020-2034, and set forth the applicable terms and conditions. Nothing in the Second Amendment purported to modify the prior Term Extensions, much less abolish Monsanto's right to enjoy the Term Extensions without paying Base Rent, as provided for in Section 41 of the lease. Rather, the Second Amendment explicitly confirmed that the Term Extensions remained governed by Section 41. See, e.g., J.A. 329 ("Following the exercise by Tenant of both of its existing 5-year extension options under Section 41 of the Lease . . . .").

We are not persuaded by ARE-108's arguments to the contrary. ARE-108 first notes that the Additional Extension Terms could only be exercised after the Term Extensions and "on the same terms and conditions as this Lease (other than Base Rent)." J.A. 329 (emphasis added). ARE-108 argues that "the specific reference to the existence of Base Rent at the time of the potential exercise of the Additional Extension Right . . . clarifies that Base Rent is being paid by Monsanto to ARE-108

10

immediately prior to the exercise of any Additional Extension Right."[4] Br. of Appellant/Cross-Appellee 26-27. We reject ARE-108's contorted reading. The quoted language simply indicates that new Base Rent provisions would govern the Additional Extension Terms, and the paragraph that follows in the Second Amendment specifies that Base Rent would be determined by the Market Rate. The quoted language has no effect on the Term Extensions.

ARE-108 next points to the language stating that the Market Rate "shall in no event be less than the Base Rent payable as of the date immediately preceding the commencement of such Additional Extension Term increased by 103% multiplied by such Base Rent." J.A. 329. ARE-108 argues that if no Base Rent were payable during the Term Extensions, which immediately preceded the commencement of the Additional Extension Terms, the quoted language would simply mean that the Market Rate could not be less than zero. ARE-108 contends that it would be "illogical" for the parties to use such complicated language if they simply intended for the Market Rate floor to be zero. Resp. and Reply Br. of Appellant/Cross-Appellee 14.

---

[4] ARE-108 further asserts, without citation to any particular language in the Second Amendment, that Monsanto was to continue paying Base Rent at $26,650 per month as adjusted.

11

This analysis, however, accounts only for the first Additional Extension Term. As discussed above, the Second Amendment established two Additional Extension Terms, with the Market Rate to be determined at the start of each. ARE-108 correctly observes that if no Base Rent were payable during the Term Extensions, the Market Rate floor for the first Additional Extension Term would be zero. However, the parties would still have to agree to a Market Rate, which would determine the Base Rent for the first Additional Extension Term. Thus, when determining the Market Rate for the second Additional Extension Term, the Market Rate floor would not be zero, but 103% of the Base Rent payable at the end of the first Additional Extension Term. With both Additional Extension Terms properly accounted for, the 103% language has effect and is not simply a convoluted way of saying zero.

Furthermore, the fact that the Market Rate floor for the first Additional Extension Term may be zero does not render the "meaning" of the Second Amendment's words or the "effect of [its] provisions" uncertain. Register, 599 S.E.2d at 553. The meaning is clear, even if ARE-108 finds it to be unfavorable. See Gas House, Inc. v. S. Bell Tel. & Tel. Co., 221 S.E.2d 499, 504 (N.C. 1976) ("People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad

12

bargain." (quoting 14 Samuel Williston, <u>A Treatise on the Law of Contracts</u> § 1632 (3d ed. 1961))), <u>overruled in part by</u> <u>State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co.</u>, 299 S.E.2d 763 (N.C. 1983).

Lastly, ARE-108 cites the Second Amendment's clause stating that "[i]n the event of any conflict" between the Second Amendment and the lease, the "Second Amendment shall prevail," and "the terms and provisions of the Lease are hereby amended to the extent necessary to give effect to the purpose and intent of this Second Amendment." J.A. 333. This language is of no avail to ARE-108 as there is no conflict between the Second Amendment and the Base Rent-free Term Extensions established in the lease, and no amendment to the lease is necessary to give effect to the Second Amendment.

Ultimately, the language ARE-108 cites cannot fairly be read as revoking Monsanto's clearly established right to Base Rent-free Term Extensions. Thus, ARE-108 has not shown that the lease, as amended, is capable of multiple "reasonable interpretations." <u>Register</u>, 599 S.E.2d at 553. Nor has ARE-108 identified "extraneous facts" that make the definite application of the amended lease impracticable.[5] <u>Miller</u>, 112 S.E. at 418.

---

[5] ARE-108 insinuates that the present dispute implicates the parties' other, "interrelated" leases for properties in Research Triangle Park. <u>See, e.g.</u>, Br. of Appellant/Cross-Appellee 9-10. (Continued)

In short, ARE-108 has demonstrated no ambiguity, latent or otherwise, as to whether Monsanto owes Base Rent during the Term Extensions.  Monsanto unambiguously does not.

Because the lease is unambiguous, the district court did not abuse its discretion in denying ARE-108's Rule 56(d) request for discovery, as unambiguous contracts are to be construed without resort to extrinsic evidence.  See World-Wide Rights Ltd. P'ship, 955 F.2d at 245; see also Piedmont Bank & Trust Co. v. Stevenson, 339 S.E.2d 49, 52 (N.C. Ct. App. 1986), aff'd, 344 S.E.2d 788 (N.C. 1986) ("When the language of the contract is clear and unambiguous . . . the court cannot look beyond the terms of the contract to determine the intentions of the parties.") (internal citation omitted).[6]

---

However, ARE-108 never explains how those leases affect the interpretation of the lease presently in dispute. Thus, those leases do not provide a basis for finding a latent ambiguity.

ARE-108 also recites the principle that a contract "encompasses not only its express provisions but also all such implied provisions as are necessary to effect the intention of the parties unless express terms prevent such inclusion." Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973).  However, we will not read in a provision requiring Monsanto to pay Base Rent during the Term Extensions.  Such a provision is not necessarily implied by amended lease and contradicts its express terms.

[6] For this reason, we do not consider the extrinsic evidence submitted by ARE-108.  We also do not consider ARE-108's argument, raised for the first time on appeal in its reply brief, that it was denied an opportunity to present a defense of mutual mistake.  See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (explaining that issues raised for the first time on (Continued)

14

Accordingly, we affirm the district court's grant of summary judgment to Monsanto.

IV.

Monsanto cross-appeals the district court's denial of its request for attorneys' fees under North Carolina General Statutes § 6-21.2. We review de novo the district court's resolution of questions of state law. Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 512 (4th Cir. 1999).

The North Carolina Supreme Court has explained that contractual attorneys' fees provisions are generally not enforceable under North Carolina law:

> [T]he jurisprudence of North Carolina traditionally has frowned upon contractual obligations for attorney's fees as part of the costs of an action. . . . Thus the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor.

appeal will not be considered absent exceptional circumstances); Cavallo v. Star Enter., 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (explaining that arguments raised for the first time in a reply brief are not properly before the Court).

Stillwell Enters., Inc. v. Interstate Equip. Co., 266 S.E.2d 812, 814-15 (N.C. 1980) (internal citations omitted).

Monsanto claims that § 6-21.2 provides the statutory authority necessary to enforce the lease's attorneys' fees clause. That statute "allows an award of attorneys' fees in actions to enforce obligations owed under an evidence of indebtedness that itself provides for the payment of attorneys' fees." Trull v. Cent. Carolina Bank & Tr., 478 S.E.2d 39, 42 (N.C. Ct. App. 1996)(quotation omitted), aff'd in part, review dismissed in part, 490 S.E.2d 238 (N.C. 1997). Section 6-21.2 states, in relevant part:

> Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness . . . shall be valid and enforceable, and collectible as part of such debt, if such note, contract or other evidence of indebtedness be collected by or through an attorney at law after maturity, subject to the following provisions:
>     . . . .
>     (2) If such note, conditional sale contract or other evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note, contract or other evidence of indebtedness.

N.C. Gen. Stat. § 6-21.2. The party seeking attorneys' fees must provide notice to the debtor, and if the debtor pays the outstanding balance within "five days from the mailing of such notice . . . . the obligation to pay the attorneys' fees shall be void." Id. § 6-21.2(5).

16

Monsanto argues that the lease is evidence of ARE-108's indebtedness to Monsanto for the Base Rent Monsanto paid under protest, and that Monsanto is thus entitled to attorneys' fees of fifteen percent of the final judgment. We disagree.

As Monsanto notes, § 6-21.2 is a remedial statute that is "construed liberally to accomplish the purpose of the Legislature." Stillwell Enters., Inc., 266 S.E.2d at 817 (quoting Hicks v. Albertson, 200 S.E.2d 40, 42 (N.C. 1972)). Thus, while it most commonly applies to promissory notes and conditional sale contracts, the term "evidence of indebtedness" is broadly defined to include "any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money." Id. at 293-94 (emphasis added). Applying this definition, the Stillwell court found that a lease of goods was an "evidence of indebtedness" because the lease "acknowledge[d] a legally enforceable obligation by plaintiff-lessee to remit rental payments to defendant-lessor as they become due," and it was "executed by the parties obligated under its terms." Id. at 818. Similarly, a lease of real property may constitute "evidence of indebtedness." See, e.g., RC Assocs. v. Regency Ventures, Inc., 432 S.E.2d 394, 397 (N.C. Ct. App. 1993).

However, even under this liberal definition, the lease here is not evidence of the indebtedness Monsanto seeks to collect,

17

namely, the Base Rent that it paid under protest. Simply stated, the lease does not evidence "on its face" ARE-108's obligation to return overpaid Base Rent. It therefore cannot be said that ARE-108 acknowledged such an obligation when it executed the lease. See Stillwell Enters., Inc., 266 S.E.2d at 817 ("[A]n evidence of indebtedness . . . is a writing which acknowledges a debt or obligation and which is executed by the party obligated thereby.")(emphasis added).

It is not sufficient that ARE-108 may "owe" Monsanto the return of overpaid rent, or that the overpaid amount may be referred to as "debt." Cf. Pantry Pride Enters., Inc. v. Glenlo Corp., 729 F.2d 963, 965 (4th Cir. 1984). To satisfy § 6-21.2, the debt must appear "on the face" of the instrument. It is similarly of no avail that the "pay-under-protest avenue is implicitly available to tenants under all leases." Br. of Appellee/Cross-Appellant 48. Under Stillwell, an "evidence of indebtedness" may not be based on an implicit debt. Monsanto cites no authority to the contrary, and we decline to further extend an already broadly defined statutory term.

Indeed, the interpretation advanced by Monsanto could significantly expand the scope of § 6-21.2. For example, a party that breaches a contract typically "owes" damages to the non-breaching party. Monsanto's interpretation would suggest that all contracts are therefore implicitly "evidence of

18

indebtedness" for damages resulting from a breach.  We do not think such an expansive reading is appropriate for a statute that, at its core, is meant to apply to notes, conditional sale contracts, and similar debt instruments.

Monsanto further argues that as a matter of policy, § 6-21.2 should be construed as authorizing attorneys' fees here because, had Monsanto instead refused to pay the disputed rent, and had ARE-108 filed suit and prevailed, ARE-108 would likely be entitled to attorneys' fees under § 6-21.2.

However, § 6-21.2 is not a bilateral statute.  It "governs only attorney's fees for the creditor's attorney," In re Vogler Realty, Inc., 722 S.E.2d 459, 464 (N.C. 2012), and its purpose "is to allow the debtor a last chance to pay his outstanding balance and avoid litigation, not to reward the prevailing party with the reimbursement of his costs in prosecuting or defending the action."  Trull, 478 S.E.2d at 42.  Thus, § 6-21.2 does not contemplate equivalent outcomes for both parties.

Moreover, in the hypothetical scenario proposed by Monsanto, ARE-108 would be entitled to attorneys' fees because Monsanto's obligation to pay rent appears "on the face" of the lease.  However, ARE-108's obligation to return overpaid rent does not.  In our view, the requirement that the debt appear "on the face" of the instrument is not merely a technicality, but serves an important policy purpose.  That is, because only the

19

debtor may be liable for attorneys' fees under § 6-21.2, it is important that the debt to which the attorneys' fees attach appears "on the face" of the instrument executed by the debtor (as is the case with most debt instruments). Awarding attorneys' fees based on an implied debt not appearing "on the face" of the instrument would eliminate this protection for debtors. For this reason, granting Monsanto attorneys' fees here would not serve the purpose of the statute "just as much" as granting ARE-108 attorneys' fees would in the converse scenario posed by Monsanto. Br. of Appellee/Cross-Appellant 50.

We conclude that, under the facts presented here, the lease is not an "evidence of indebtedness" under § 6-21.2.[7] Thus, we affirm the district court's denial of Monsanto's request for attorneys' fees.[8]

---

[7] We therefore need not decide whether Monsanto has satisfied the other requirements of this statute.

[8] Our reasoning differs somewhat from the district court's. See Cochran v. Morris, 73 F.3d 1310, 1315 (4th Cir. 1996)(explaining that courts of appeals may "uphold judgments of district courts on alternate grounds"). Among other things, the district court found that Monsanto's claim to recover overpaid Base Rent arose, not under the lease, but under a "separate agreement settling, in part, claims that were threatened" by ARE-108. J.A. 720. The district court found that such separate agreement contained no attorneys' fees provision. Id. On appeal, both parties contend that no such separate agreement existed, and we agree.

V.

For these reasons, we affirm the district court.

AFFIRMED